89 F.Supp. 528 (1950)
KATZ DRUG CO.
v.
KATZ.
No. 4495.
United States District Court E. D. Missouri, E. D.
March 22, 1950.
*529 Paul R. Stinson, Kansas City, Mo., Stinson, Mag, Thompson, McEvers & Fizzell, Kansas City, Mo., Thomas S. McPheeters, Sr., St. Louis, Mo., Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for plaintiff.
Joseph J. Gravely, St. Louis, Mo., Roy A. Lieder, St. Louis, Mo., for defendant.
MOORE, Chief Judge.
This is an unfair competition suit. Plaintiff operates a chain of stores and conducts and advertises its business in its corporate name "Katz Drug Company", and also under the trade names "Katz", "Katz Drug Stores" and Katz Super Stores". It uses drawings of cats or kittens in connection with the printed words and names.
The defendant, Meyer L. Katz, a registered pharmacist, owns and manages one small neighborhood drug store in a residence district in the City of St. Louis. He was born in the City of St. Louis in 1910 and has lived in said city throughout his life. He finished grammar school at the age of thirteen and having developed a desire to become a druggist he decided to take a scientific course in high school. After graduating from such a course, he entered the St. Louis College of Pharmacy and graduated from said college in 1929 at the age of twenty. While attending the College of Pharmacy he worked after school hours in a drug store, and after graduation was employed in several local drug stores.
On March 1, 1933, defendant purchased a drug store at 5393 Easton Avenue in St. Louis, which will be hereafter referred to as the "Easton Avenue Store". This store was operated continuously until January 18, 1946.
Immediately after the opening of the Easton Avenue Store, defendant had painted on the windows "Katz Drugs" in block letters with the representation of the head of a cat. Later, defendant displayed a neon sign "Katz Drugs". From the beginning in 1933, until 1936, defendant's drug store was listed in the St. Louis Telephone Directory as "Katz Drug Store" and thereafter the listing was "Katz Drugs", which is his present listing.
Shortly after the opening of his store, the defendant adopted labels with "Katz Drugs" and the representation of the head of a cat, and this type of label he has continued to use to now.
In 1945 defendant bought a drug store at the corner of Union Avenue and Delmar Boulevard in St. Louis, which he now operates, and three months later he sold his Easton Avenue Store and the name on that store was changed.
The history of the plaintiff goes back to 1914, when Isaac Katz operated a cigar store carrying also such items as fruit and candy, but not drugs, at 8th and Grand Avenue in Kansas City, Missouri. About a year later Isaac Katz was joined in a partnership with his brother, Michael Katz, and a second store was opened at 12th and McGee in Kansas City. The name "Katz Brothers" was used at that time. About the beginning of the First World War the Katz Brothers added some drugs to their stock and commenced using the terms "Katz Drugs", or "Katz Drug Stores", or "Katz Drug Company".
Isaac Katz and Michael Katz operated as partners until 1926, in which year they were incorporated under Missouri law, and so continued until 1929 when the Company became a Delaware corporation.
In August, 1929, plaintiff opened a store in St. Joseph, Missouri; in April, 1930, another in Kansas City; in May, 1930, a store in Des Moines, Iowa; in December, 1930, another store in Kansas City, Kansas; and another one in Kansas City, Missouri, in October, 1931. Subsequently, plaintiff *530 opened a number of other stores, some of them in St. Louis.
Plaintiff, in its advertising, has always featured its corporate name and the words "Katz Drugs" and "Katz Super Stores", and it had long used cats and kittens as symbols in its advertising.
Plaintiff prays that the defendant be enjoined from using the name "Katz", "Katz Drugs", or "Katz Drug Co.", and from using the symbol or symbols of a cat or cats in St. Louis or elsewhere.
Defendant in his answer and counterclaim avers that he was well established in the retail drug business in St. Louis under the name "Katz Drugs" and "Katz Drug Store" before plaintiff ever opened a store in St. Louis, and denies that any act of his and any use by him of the name "Katz Drugs" or "Katz Drug Store", or a picture of a cat, is misleading or confusing plaintiff's customers or the buying public, or has ever done so; and defendant further avers that if there be any confusion on the part of the buying public, the fault is that of plaintiff, which has invaded defendant's trade territory, although well knowing defendant was already established in the drug business in St. Louis under the name "Katz Drugs" or "Katz Drug Store".
Defendant's answer and counterclaim concluded with a prayer that plaintiff be restrained and enjoined from using the name "Katz", "Katz Drugs", or "Katz Drug Company" in the City of St. Louis and surrounding trade territory, and that plaintiff be required to account for all damages suffered by defendant and for all profits made by plaintiff in the operation of its stores in St. Louis and Wellston.
Plaintiff's trial brief sets forth that "Plaintiff's asserted right to injunctive relief will be pressed in these points:
"(1) Years of advertising of `Katz' in plaintiff's corporate and trade names has given it a secondary meaning and created a property right in plaintiff;
"(2) That property right had extended to St. Louis in 1933 (a) because the secondary meaning was already there, and (b) in contemplation of law because St. Louis was within the natural field of plaintiff's expansion;
"(3) Plaintiff being `first in the field', defendant is bound to distinguish his business from plaintiff's. He has no absolute right to the use of his own name;
"(4) Plaintiff has not been guilty of laches; but even laches does not bar injunctive relief;
"(5) The equities overwhelmingly preponderate in plaintiff's favor."
At the beginning plaintiff contended that plaintiff was "first in the field" in metropolitan St. Louis (a) because its corporate and trade names had acquired a secondary meaning there before 1933 when defendant opened his Easton Avenue Store and (b) St. Louis was in the normal field of plaintiff's expansion: plaintiff further contended that whether or not the earned secondary meaning attached to plaintiff's corporate and trade names included St. Louis in 1933, nevertheless that area was then within the normal and legitimate field of plaintiff's expansion; and that plaintiff's rights and the law's protection were then the same as in Kansas City, St. Joseph and elsewhere.
Defendant testified that at the time he opened his store on Easton Avenue, in March, 1933, he had never heard of the plaintiff.
On March 5, 1934, Max Skeer of Kansas City, Missouri, a real estate agent, who was the representative of the plaintiff, called on the defendant and demanded that the defendant take his name off the window. The defendant testified that Skeer offered him $25 if he would take the sign down and have it changed to "Meyer Katz Drug Store"; and that Skeer then raised his offer to $100 and finally to either $250 or $500, and that he told Mr. Skeer he would think it over.
The testimony of Skeer was that he explained to defendant that Katz of Kansas City was coming to St. Louis and that there might be some confusion, and asked defendant if he could not change his sign and eliminate the use of the cat and use the name "Meyer Katz"; and that he told defendant he would recommend to plaintiff *531 that it pay the expense of changing the sign. Skeer testified he told defendant that he had no right to use the name "Katz" or the symbol of a cat.
Defendant testified that after the visit of Mr. Skeer, during which Mr. Skeer told him he would have to take his name off the sign at his store, he went downtown and consulted an executive of the Meyer Bros. Drug Company and Mr. Alex Rubenstein of the Economical Drug Co., defendant being a customer of both companies. Defendant testified that Mr. Rubenstein asked him why he didn't open some more stores.
The day following his first visit, defendant stated Mr. Skeer made a second call and offered him $2500 and then $5,000; and that he told Mr. Skeer he would keep his name on his drug store. Defendant further testified that after the second visit from Mr. Skeer he again saw Mr. Rubenstein, who said: "Why not open some stores of your own?"; that Mr. Rubenstein told him he thought he could get him the money; that he could get some financial people who would be willing to make a loan. Following this, Mr. Rubenstein took him to Rubenstein's lawyers, and a company was incorporated "The Druggists Investment Co.", and defendant signed a contract April 6, 1934, to go into business with the Druggists Investment Co., operating his Easton Avenue Store and opening another store at 711 Olive Street, St. Louis, profits of the Easton Avenue Store to be divided fifty-fifty, and seventy-thirty so far as 711 Olive Street was concerned. Defendant agreed to give the enterprise the use of the name "Katz", "Katz Drugs" and "Katz Drug Stores"; and they contemplated opening other stores.
Previous to April 6, 1934, when said contract was signed, there had appeared an article on March 11, 1934, in the St. Louis newspapers, stating that the Kansas City Katz was coming to St. Louis and would open a store at the Southwest Corner of 7th and Locust Streets, which is just around the corner from 711 Olive St.
Defendant testified he never knew until twelve years later who was back of Druggists Investment Company; that he did not know that the real backer was the May Department Stores, owners of Famous-Barr store, which operated the largest department store in St. Louis, just across the street from the proposed location of plaintiff. Another store was later opened by the Druggists Investment Company on Lee Avenue, in which defendant was interested, and Druggists Investment Company also opened another store, later, on Market Street, in which defendant was not interested.
On May 10, 1934, shortly after defendant signed the contract with Druggists Investment Company, a suit for unfair competition against the defendant and Mr. Rubenstein was brought by plaintiff. Said suit was dismissed in January, 1935; and, later, August 10, 1935, defendant withdrew from the contract with Druggists Investment Company, took back his own Easton Avenue store, and conveyed to Druggists Investment Company the right to continue to use the name "Katz" and "Katz Drugs" and "Katz Drug Store".
The 711 Olive Street store was closed on February 1, 1936, more than one year after the first unfair competition suit of plaintiff against defendant was dismissed, and the Druggists Investment Company was dissolved in 1938 and there was no outstanding right on the part of any one to use the name of this defendant in any business.
The defendant is the sole owner, at the present time, of the drug store at Union and Delmar, and has no interest in any other drug store.
All of the testimony is to the effect that defendant has never at any time taken the initiative in asking money from the plaintiff for changing the signs; but the plaintiff has from time to time offered money to defendant. The plaintiff's own agent testified that defendant never contacted him between the years 1934 and 1946: defendant never approached plaintiff for money, but increasing sums of money were mentioned from time to time by the plaintiff, all of which were rejected by defendant.
Plaintiff opened its first store in St. Louis in November, 1936, almost four years after defendant began operations on Easton *532 Avenue; and plaintiff admitted that it knew of the existence of defendant while negotiations were under way for plaintiff's opening of a store in St. Louis.
The plaintiff's second drug store in the St. Louis area was opened in 1937, and was located at 6100 Easton Avenue, only a few blocks from the defendant's store.
Plaintiff has conceded in oral argument and in memoranda filed with the Court that plaintiff's trade names did not have a secondary meaning in the full sense of the term in St. Louis in March, 1933, but maintains that its name was known to investors, retailers, wholesalers and a minority of average customers, and that it had attained a secondary meaning over a substantial part of the State before that time: and plaintiff further contends that it was first in the field in metropolitan St. Louis (a) because its corporate and trade names had acquired a secondary meaning in Kansas City and other places where it operated and (b) that in March, 1933, when defendant opened his Easton Avenue store, St. Louis was in the normal field of plaintiff's expansion. Plaintiff further contends that it was here before defendant opened his store in 1933 because it had been in correspondence and negotiations with St. Louis real estate interests in regard to possible locations in St. Louis. The plaintiff further contends that it did expand into St. Louis, and that the success of the expansion demonstrates conclusively that St. Louis was in the normal field of plaintiff's expansion.
Jurisdiction of this Court depends on diversity of the parties and the amount in controversy. Defendant has denied that the latter exceeds $3,000. The value of the plaintiff's alleged right to use its trade-mark and trade name in the St. Louis area is certainly in excess of the required amount. The extensive advertising of the plaintiff in St. Louis, from 1936 to the date of filing this suit, alone establishes this. Plaintiff's sales in St. Louis in 1947 totalled approximately $5,500,000.
The right to the use of a trade-mark or trade name rests on the laws of the several states, and the law of the state in which infringement is asserted will govern. In the absence of State authorities, common law principles of general application will govern. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 411, 36 S.Ct. 357, 60 L.Ed. 713; United Drug Co. v. Theodore Rectanus, 248 U.S. 90, 98-99, 39 S.Ct. 48, 63 L.Ed. 141; General Finance Loan Co. v. General Loan Co., 8 Cir., 163 F.2d 709, 712.
Plaintiff alleges infringement of its trade name and trade-mark. Confusion in recent years was shown. Since defendant first employed the mark he is now using in 1933, and has since used it continuously, it is clear that the defendant's right to use that name and mark is to be determined on the facts as they existed in 1933. Though defendant has sold the store he opened in 1933, his uncontradicted testimony is that his present store is within the trade area of his old store.
Secondary meaning must be proved by a fair preponderance of evidence. Gillette Safety Razor Co. v. Triangle Mech. Lab. Corp., D.C., 4 F.Supp. 319, 322. The evidence shows that plaintiff in the year 1932 operated eight super drug stores; five in Kansas City, Missouri, and one in each of the following cities  Kansas City, Kansas; St. Joseph, Missouri, and Des Moines, Iowa. The first two stores were opened in Kansas City, Missouri, in the years 1914 and 1915; the third in Kansas City, Kansas, in 1929; the fourth was opened in St. Joseph, Missouri, in 1929; the fifth in Kansas City, Missouri, in 1930; the sixth in Des Moines, Iowa, in 1931; the seventh and eighth in Kansas City, Missouri, in 1931 and 1932. The gross sales of the plaintiff increased from $50,601.92 in 1917 to $7,480,828, in 1933. Presumably, the bulk of these sales was in Kansas City, Missouri, where five of plaintiff's then eight stores were located. Plaintiff advertised in these cities in newspapers, on the radio, and in streetcars.
In St. Joseph from 1929 to 1933, and in Des Moines from 1930 to 1933, plaintiff ran a full page advertisement once a week, and smaller advertisements twice a week. In Kansas City, plaintiff, after 1930, ran a double page advertisement in the Sunday *533 paper, a single page in the Thursday paper, and smaller daily advertisements. The total spent on the various types of advertising in the four cities in which plaintiff's stores were then located, in the period from 1923 to 1933, ranged from $40,000 in 1924 to $239,000 in 1931. In the period from 1930 to 1933, the amount was over $200,000 annually. There was also testimony to the effect that the Katz Drug Company was generally referred to by the public in Kansas City as "Katz", prior to 1933.
Much of the evidence in this connection relates to the years 1934 to 1948, and it is of no value in establishing a secondary meaning in 1933. There is, however, sufficient evidence to establish the fact that the name "Katz" had acquired a secondary meaning in 1933 in Kansas City, if not in Des Moines and St. Joseph. Direct evidence of the meaning of the trade name or trade-mark in the mind of the public is not essential. Secondary meaning may be established by a showing of long use, extensive advertising, and large sales. General Shoe Corporation v. Rosen, 4 Cir., 111 F.2d 95, 99; Shaler Co. v. Rite-Way Products, 6 Cir., 107 F.2d 82, 84; F. W. Fitch Co. v. Camille, Inc., 8 Cir., 106 F.2d 635, 638; Restatement of the Law, Torts. Section 716, comment b. vol. 3, p. 560.
Plaintiff has, however, failed to establish a secondary meaning in St. Louis in 1933, and has so conceded.
As stated above, plaintiff has established that it had a secondary meaning in Kansas City in 1933; that in that year it was planning to open a store in St. Louis at some future time and had begun negotiations for obtaining a location for the proposed St. Louis store; and that its trade name was known to a small, indefinite number of St. Louis suppliers and stockholders. The secretary of the plaintiff corporation stated that plaintiff made some mail-order sales in St. Louis, but the number of such St. Louis customers and the volume of such sales could not be given. Plaintiff claims that the St. Louis area was, in 1933, within the normal and legitimate field of its expansion, and that, therefore, its trade name should receive the same protection in St. Louis as it would have in Kansas City, at that time.
Before turning to an examination of authorities, in order to determine the accuracy and extent of this proposition of law, it might be well to set out as a guide some principles of trade-mark law:
"There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business." United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, loc. cit. 97, 39 S.Ct. 48, 50, 63 L.Ed. 141.
"The redress that is accorded in trade-mark cases is based upon the party's right to be protected in the good will of a trade or business." Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, loc. cit. 412, 36 S.Ct. 357, 360, 60 L.Ed. 713.
"The prevailing Federal view is to do away with the rule that competition is an indispensable requirement before the courts will grant relief and to consider the lack of competition as only a factor in the case in the defendant's favor." Safeway Stores v. Sklar, D.C., 75 F.Supp. 98, loc. cit. 103.
It is to be noted, first, that the Hanover case, supra, set out the rule that where two parties independently employ the same mark in separate, wholly remote markets, the question of prior appropriation is legally insignificant, unless the second adopter has selected the mark "with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like", 240 U.S. loc. cit. 415, 36 S.Ct. 361, 60 L.Ed. 713. The opinion left open the question of a junior appropriator who occupies territory which "would probably be reached by the prior user in the natural expansion of his trade *534 * * *". The concept of a market area into which a given business may normally expand is difficult, at best. To say that a junior appropriator, in a "separate" and "wholly remote" market might adopt another's trade-mark in order to forestall the senior user's extension of his trade, presumably an extension into this "separate" and "wholly remote" market, and a market into which the senior user would not "naturally" expand, is merely confusing. Except in a case where the junior user has knowledge of a contemplated move by the senior user, how could the junior user forestall the expansion of trade into a territory into which the senior user would not "naturally" expand? Similarly, it is unlikely that a senior user will have a reputation in a wholly remote market, into which he will not naturally expand. It does, however, seem clear that bad faith or improper motive on the part of the junior appropriator entitles the senior appropriator to redress. It should also be noted that the Hanover case was decided on the proposition that the first user "must be held to have taken the risk that some innocent party might, during [the first user's inactivity in the remote territory] * * * hit upon the same mark * * *". [240 U.S. 419, 36 S.Ct. 363].
The next Supreme Court opinion on this subject, United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141, added nothing to the law of the Hanover case. The rule that the first user runs the risk that a second user, in a remote market, may in good faith hit on the same mark was followed. The plaintiff claimed only that it had been "reasonably diligent" in extending its trade territory, not that defendant had occupied a trade area which would have been reached by plaintiff in the natural expansion of its business.
A number of cases have been cited by plaintiff's counsel in support of the field of natural expansion theory. It is readily seen that these cases do not require the plaintiff to show competition or loss of trade in order to obtain injunctive relief; but it is also apparent that in these cases there was present a showing of one of the following facts: either (1) that the junior appropriator adopted the senior user's mark with a "design inimical to the interests" of the latter, that is, adopted it in bad faith; or (2) that the senior user, at the time of the adoption of the mark by the junior user and in the territory in which the junior user employed the mark, had something variously denominated by different courts as "secondary meaning", "good-will", or "reputation". These cases are: White Tower System v. White Castle System, 6 Cir., 90 F.2d 67, 69-70 (bad faith and reputation); Grocers Baking Co. v. Sigler, 6 Cir., 132 F.2d 498, 501, 502; (good will and bad faith); R. H. Macy & Co. v. Colorado Clothing Mfg. Co., 10 Cir., 68 F.2d 690, 692 (secondary meaning); Rainbow Shops, Inc., v. Rainbow Specialty Shops, 176 Misc. 339, 27 N.Y.S.2d 390, 392 (confusion); Local Loan Co. v. Local Finance Co., D.C., 56 F.Supp. 658 (confusion and secondary meaning; junior user adopted with knowledge of the senior user's employment); Standard Oil Co. v. Michie, D.C., 34 F.2d 802, 804 (confusion); Peninsular Chemical Co. v. Levinson, 6 Cir., 247 F. 658 (bad faith and confusion); Western Oil Refining Co. v. Jones, 6 Cir., 27 F.2d 205 (confusion and bad faith); Stork Restaurant v. Sahati, 9 Cir., 166 F.2d 348, 358 (reputation and confusion); Food Fair Stores v. Food Fair, 1 Cir., 177 F.2d 177, 185 (secondary meaning).
In the present case, the defendant did not adopt the plaintiff's mark with a "design inimical to the interests" of the plaintiff. He did not even know according to his own testimony (which was not contradicted), that the plaintiff had such a mark. There was no proof of the plaintiff's allegation that defendant knew the plaintiff was planning in 1933 to come to St. Louis; nor is there any evidence that the plaintiff in 1933 had any reputation of which defendant, or any one, could have taken the benefit by adopting the plaintiff's name. Nor did the plaintiff establish that it had acquired a secondary meaning, or a reputation, or good will in St. Louis. The plaintiff argues only that in 1933 it would, in the natural expansion of its business enterprise, eventually have established a *535 store in St. Louis, and was at the time negotiating for the location of the store. I have found no case saying that that alone is sufficient to entitle it to protection.
Plaintiff has referred to the Restatement of The Law, Torts, Sections 731(b) and 732. It is apparent that Section 731(b) is intended to cover expansion from one kind of business, or goods, to another, and does not refer to territorial expansion of a business. Section 732 reads as follows: "The interest in a trade-mark or trade name is protected, under the rule stated in Sec. 717, with reference only to territory from which he receives or, with the probable expansion of his business, may reasonably expect to receive custom in the business in which he uses his trade-mark or trade name, and in territory in which a similar designation is used for the purpose of forestalling the expansion of his business."
A careful reading of the comment under this section indicates that, even in the absence of bad faith, protection is to be given a mark in territory in which the mark is unknown, as against an innocent junior appropriator. It reads in part:
"If the trade-mark or trade name is unknown in a particular territory and there is no probability that it will become known there, the use of a similar designation in that territory will cause no harm to the person having the trade-mark or trade name, since it cannot lead to mistaken association with that person." (Italics the Courts.)

* * * * * *
"In each case the issue is whether, in the territory in which the similar designation is used, there are or are likely to be a considerable number of prospective purchasers of the goods or services in connection with which the trade-mark or trade name is used, who are likely to be misled by the similarity." (Italics the Courts.)
If this interpretation is correct, it is my opinion that the Restatement here is not supported by case law.
Such a doctrine would impose a burden on the innocent junior appropriator. In adopting a trade name or trade-mark, how far must the adopter look to see if a similar mark is in use? If a similar mark is in use, and it is wholly unknown in the area in which the so-called adopter wishes to use it, there is nothing to put him on notice. If the adopter in such a case wishes to open a retail drugstore in St. Louis, must he search Kansas City? Chicago? Des Moines? Denver? It seems unnecessary.
Plaintiff has also urged a theory to the effect that a trade-mark or trade name, when protected in one part of a state, is protected throughout the state, citing the concurring opinion of Justice Holmes in the Hanover Star Milling Co. v. Metcalf case, supra. As the Third Circuit Court of Appeals said in Jacobs v. Iodent Chemical Co., 41 F.2d 637, at 639, the Supreme Court has not adopted this view, and the area to which a trade-mark is restricted is an open question, to be decided on the facts of the case. See, also, Nims on Unfair Competition & Trade-marks, Sec. 218b., p. 653, Vol. 1, 1947 Ed. Also cited on this point were Shugart v. Rogers, Tex.Civ.App., 170 S.W.2d 813, and ABC Stores, Inc., v. T. S. Richey & Co., Tex.Com.App., 280 S.W. 177  both decisions of Texas courts. These decisions rest on a Texas statute which "was enacted for the purpose of conferring a state-wide right to the exclusive use of such particular name or device as comes within its terms" ABC Stores, Inc., v. T. S. Ritchey Co., supra, 280 S.W. at page 179, and so do not depend on common law.
I am not unmindful that the law of Missouri determines the rights of the parties. No Missouri cases, except Standard Oil Co. v. Michie, supra, hereinabove distinguished, have been cited on this point. The Missouri annotations to the Restatement of the Law, Torts, Section 732, state that the question has not arisen in Missouri. The decision in Sweet Sixteen Co. v. Sweet "16" Shop, 8 Cir., 15 F.2d 920, while following the Hanover and Rectanus cases, supra, leaves unanswered the particular question here to be decided. In that case the plaintiff's activities in the field into which it claimed the right to natural expansion, were, prior to the junior user's activities in that field, far more extensive than *536 the incidental and almost non-existent activities of the plaintiff in St. Louis in the case at bar, prior to 1933.
I further find that, even if the natural field of expansion theory, as urged by the plaintiff, is correct, plaintiff has not proved that St. Louis was in 1933 in the field of the natural expansion for a Kansas City drug store. Kansas City and St. Louis are in different Federal Reserve districts. These districts were established "with due regard to the convenience and customary course of business * * *", and have not been altered by the Federal Reserve Board, as is within its authority to do. The evidence shows that prior to 1933, only one business, a restaurant, successfully moved from Kansas City to St. Louis, and that several other Kansas City businesses were unsuccessful in such a move.
Plaintiff, in support of its argument, emphasizes the fact that it operates a system of chain stores. "It makes no difference that the first user of a trade name operates his business through multiple units located in different parts of the state. The right of a chain store operator is no different than that of others (Citations.)" Direct Service Oil v. Honzay, 1941, 211 Minn. 361, 2 N.W.2d 434, 437, 148 A.L.R. 1. Further argument is made to the effect that St. Louis was a "business natural" for plaintiff's expansion because, as a result of its peculiar organization, it was equipped to distribute by truck from a central warehouse in Kansas City to cities within a radius of two or three hundred miles of Kansas City. It is difficult to see how an innocent junior appropriator can be affected by the senior user's internal organization. The fact that plaintiff did expand to St. Louis is merely a matter of hindsight. Plaintiff offered no evidence to show that St. Louis was in the field of natural expansion of St. Joseph or Des Moines.
Defendant in his counterclaim seeks an injunction restraining plaintiff from using the name "Katz", "Katz Drugs", or "Katz Drug Company", and from interfering with the defendant's right to use his name anywhere in the City of St. Louis and its surrounding trade area, and particularly in the territory normally served by defendant's present drug store, or any store that defendant might hereafter own. Defendant introduced no evidence to establish that his trade-mark and trade name had, in 1933 or at any time subsequent, acquired a secondary meaning throughout the St. Louis area. He stated several times that his store was a "neighborhood" drug store, and has not attempted to show the extent of his trade area. He voluntarily in 1945 moved farther away from the plaintiff's Easton Avenue store, and there is no showing that plaintiff's Easton Avenue store, or any other store of plaintiff, is in the trade area, whatever it may be, of his present store.
An injunction must be limited in regard to territory. Since the defendant has not established the territorial extent of his right, the right cannot be specifically protected by injunction.
Defendant also seeks an accounting for profits. The plaintiff opened a store on Easton Avenue in 1937, a few blocks from the defendant's first store, and has operated it ever since without any complaint from the defendant. The plaintiff has since 1936 conducted an extensive advertising campaign in the St. Louis area, and has as a result achieved a large volume of sales in that area. In 1947, alone, these sales amounted to $5,500,000. It is clear that the accounting is barred by laches. McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828; San Francisco Association v. Industrial Aid, 8 Cir., 152 F.2d 532, 537. Though laches was not pleaded, the evidence in the record clearly establishes such a defense. Under Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A., the issue may be treated as if it were properly raised. Since an injunction cannot be issued for other reasons, it is unnecessary to consider the effect, if any, of the defendant's inaction in this period on his right to injunctive relief.
The complaint and counterclaim are dismissed. Findings of Fact, Conclusions of Law and a Decree in accordance with the views herein expressed may be prepared and submitted for signature.