**BENEFICIAL LOAN CORP. et al. v. PERSONAL LOAN & FINANCE CORP.**

Civ. A. No. 2322.

United States District Court
E. D. Arkansas, W. D.

Oct. 30, 1951.

House, Moses & Holmes, by Thomas C. Trimble, Jr., Little Rock, Ark., Ewing, Laughlin & Watson, by James W. Watson, Memphis, Tenn., for defendant.

LEMLEY, District Judge.

This cause having, by agreement of the parties, been tried to the Court at the City of Hope, Arkansas, upon the pleadings, pretrial briefs, opening statements of counsel, the testimony of witnesses taken *ore tenus* before the bar of the Court and the exhibits thereto, and oral argument, and the Court, being fully advised doth make the following Findings of Fact, Conclusions of Law, and Comment thereon, to-wit:

A. Findings of Fact.

1.

The plaintiffs herein are the following corporations: Beneficial Loan Corporation (hereinafter sometimes called "Beneficial"); Personal Finance Company of Little Rock; Personal Finance Company of Fort Smith; Personal Finance Company of Texarkana; Personal Finance Company of El Dorado; Personal Finance Company of Pine Bluff; Personal Finance Company of Jonesboro; and Personal Finance Company of Arkansas. All of the plaintiffs, except Personal Finance Company of Arkansas, are corporations organized and existing under the laws of the State of Delaware; Personal Finance Company of Arkansas is a corporation organized and existing under the laws of the State of Arkansas. The plaintiffs, with the exception of Beneficial Loan Corporation, will be sometimes hereinafter referred to as the "operating plaintiffs". All of the operating plaintiffs are wholly owned subsidiaries of Beneficial Loan Corporation; these operating plaintiffs, together with other corporations wholly owned by Beneficial and having the words "Personal Finance Company" as an integral part of their corporate names, comprise a group or chain of "small loan companies" doing business in 36 states of the Union and in the Dominion of Canada. This chain will at times be referred to as the "Beneficial Group".

The defendant herein is a corporation organized and doing business under the laws of the State of Tennessee; it is likewise engaged in the "small loan" business.

Wright, Harrison, Lindsey & Upton, by Edward L. Wright, Little Rock, Ark., for plaintiffs.

The amount in controversy in this cause, exclusive of interest and costs, exceeds the sum of $3,000.

2.

All operating plaintiffs, except Personal Finance Company of Arkansas, have qualified to do business in Arkansas as foreign corporations, and all of them have likewise been licensed by the Arkansas State Bank Department to engage in the "small loan" business in Arkansas under the terms of Act 203 of the 1951 General Assembly of the State of Arkansas. All of the operating plaintiffs applied to the State Bank Department on April 6, 1951, for authority to engage in the small loan business in Arkansas under the terms of said Act; the dates that such licenses were issued and the dates upon which they actually commenced business in Arkansas are set forth in the following table:

| Name | Date of License | Date of Opening of Office | Place |
| --- | --- | --- | --- |
| Personal Finance Company of Arkansas | 5-31-51 | 6-4-51 | North Little Rock |
| Personal Finance Company of Little Rock | 5-31-51 | 6-4-51 | Little Rock |
| Personal Finance Company of Pine Bluff | 5-31-51 | 6-4-51 | Pine Bluff |
| Personal Finance Company of Fort Smith | 6-6-51 | 6-11-51 | Fort Smith |
| Personal Finance Company of Jonesboro | 6-6-51 | 6-18-51 | Jonesboro |
| Personal Finance Company of El Dorado | 6-21-51 | 6-25-51 | El Dorado |
| Personal Finance Company of Texarkana | 6-29-51 | 8-6-51 | Texarkana |

All of the operating plaintiffs after opening their offices, as above set forth, did business continuously between the respective dates of opening and the filing of this suit on August 24, 1951, and have continuously done business since said time at their respective locations.

3.

The defendant qualified to do business in the State as a foreign corporation on June 1, 1951; it was licensed under Act 203 of 1951 on August 8, 1951, having applied for such a license on July 19, 1951. Prior to the filing of this action, the defendant had obtained an office in the City of Little Rock where it proposes to do a small loan business. It has no plans at the present time to engage in such business in Arkansas outside of Pulaski County, in which the cities of Little Rock and North Little Rock are located.

3a.

At the time this suit was filed the defendant had not commenced actual operations in Arkansas, and upon the filing of the suit it forbore such operations pending the disposition of this litigation. It has engaged in the small loan business in Memphis, Tennessee since January, 1948.

4.

The operating plaintiffs, on the one hand, and the defendant, on the other hand, are engaged in the business of making what are known as "small" or "personal" loans. Such loans, varying in amount, are made to private individuals, to be repaid in installments which usually fall due monthly and are usually equal in amount; the proceeds of such loans are used by the borrowers for their own purposes. Such loans are usually made to salaried people, wage earners, and persons with fixed incomes, who are considered to be able and willing to pay the installments as they fall due.

The small loan business is essentially local in its nature and the largest area which can be feasibly served by a given office is a city,

or at most, a city and the surrounding county. Because of the local character of the business, the area of direct competition between the plaintiffs and the defendant in Arkansas is limited to Pulaski County, Arkansas.

### 5.

The plaintiffs brought this action to enjoin the defendant from operating in Arkansas under its corporate title, "Personal Loan & Finance Corporation", and to further enjoin it from using the word "personal" in association with the words "loan" or "finance" in its advertising and literature. The plaintiffs contend that by reason of the extensive operations and advertising of the Beneficial Group of small loan companies, nationally and outside of Arkansas, prior to the dates upon which the operating plaintiffs commenced business in Arkansas, as set forth above, and by further reason of the operations and advertising of the operating plaintiffs since those dates and prior to the filing of this suit, the Beneficial Group, including the operating plaintiffs, has become identified in the minds of the borrowing public in Arkansas with honesty and fair dealing in the small loan field; that said Group has become known to said borrowing public as "Personal"; that the name "Personal", standing alone, and the name "Personal", when used in association with the words "finance" and "loans", separately or together, have become so intimately identified in the mind of the borrowing public with the Beneficial Group, including the operating plaintiffs, that they have acquired a "secondary meaning" in Arkansas, which identifies the operating plaintiffs to the borrowing public; that said word having acquired such a secondary meaning, they have a property right therein which a court of equity will protect from unfair appropriation by another, and that if the defendant is permitted to operate in Arkansas under its corporate name, or to use the word "personal" in association with "loans" or "finance" in its literature and advertising, the borrowing public in Arkansas will be confused and will do business with the defendant under the impression that it is doing business with one of the operating plaintiffs, and that the plaintiffs will be irreparably damaged thereby. The prayer of the complaint is that the defendant be enjoined from operating in Arkansas under its corporate title "Personal Loan & Finance Corporation", and that it be further enjoined from using the word "personal" in association with "loans" and "finance" in its advertising and literature.

The defendant, on the other hand, denies that the word "personal" has acquired a secondary meaning in Arkansas as contended by the plaintiffs, and denies that plaintiffs are entitled to the relief sought. By way of counterclaim, it contends that it has been engaged in the small loan business in Memphis, Tennessee since 1948, that it has advertised extensively in Memphis newspapers which have a wide circulation in Arkansas, and particularly in Eastern Arkansas, and that its operations in Memphis and its advertising have invested the word "personal" with a secondary meaning in its favor; it prays that the operating plaintiffs be restrained from doing business under their corporate titles, and that they be further restrained from using the words "personal" and "finance" in relation to loans in their advertising.

### 6.

Neither plaintiffs nor defendant have shown by a preponderance of the evidence that on the date of the filing of the complaint herein or on the date of the filing of the cross complaint the word "personal", when used in the corporate name of a small loan company or when used in association with "loans" and "finance" in the advertising and literature of such a company, had acquired any secondary meaning in Arkansas generally, or in Pulaski County in particular, such as would identify in the minds of the borrowing public either the operating plaintiffs or the defendant. On the other hand, as of those dates, the word "personal" when so used, had no meaning in Arkansas except its primary meaning, which is generic and descriptive of the business in which not only the parties to this action but also many other persons and corporations are engaged.

Since the filing of this suit, however, the operating plaintiffs have continued to op-

erate and to advertise in all of the Arkansas cities where they are located, and by this time the word "personal" may have acquired a secondary meaning as contended by plaintiffs in the cities and counties in Arkansas where they are operating other than Little Rock and North Little Rock and Pulaski County. With that question the court is not concerned in this case; it may arise if the defendant hereafter undertakes to expand its business to such other cities and counties.

### 7.

Plaintiffs have failed to prove by a preponderance of the evidence that the defendant adopted its corporate name, "Personal Loan & Finance Corporation", or determined to use said name in connection with its business in Little Rock, in bad faith or with a design inimical to the interests of the Beneficial Group, including the operating plaintiffs. On the other hand, the Court finds that both parties entered Arkansas in good faith and without any fraudulent intent, and that the occasion of their coming was the passing of Act 203 of 1951. The Court does find, however, that at some time, either in June or July of 1951, a representative of the defendant contracted with a sign maker in Little Rock for a neon sign and for a temporary cardboard sign for defendant's office there. It appears that this sign maker had previously made certain signs for the operating plaintiffs and that in these signs the word "Personal" appeared in a distinctive script identical with the script in which said word is used in all of the signs, advertising matter and literature (except classified newspaper advertising) of the entire Beneficial Group. The sign maker, without the prior knowledge of the defendant or of its representative, conceived the idea of using this same script for the name "Personal" in the defendant's signs and prepared and delivered to said representative a temporary cardboard sign reading, "New Home of Personal Loan & Finance Corporation", in which the word "Personal" closely resembled the distinctive script used by the entire Beneficial Group as aforesaid. Upon delivery of said temporary sign, the sign maker informed said representative of the defendant that he had copied the plaintiffs' script and thereupon said representative directed the sign maker not to use such script in the neon sign. Said representative, nevertheless, accepted said temporary sign and placed it in the show window of the defendant's proposed office at 211 West Second Street, Little Rock, Arkansas and there it remained prominently displayed from a date sometime in July 1951, continuously until the date of the trial of this cause. Said representative took said action on his own initiative and without consulting any other stockholder or officer of the defendant. The Court finds that such act was an isolated transaction and does not establish bad faith on the part of the defendant. The Court finds, however, that if the defendant should continue to use this temporary sign, or should use other signs in which the word "personal" appears in script imitating that in which said word appears on the plaintiffs' signs and in their literature and advertising, confusion will result and the business of the operating plaintiffs in Little Rock, North Little Rock and elsewhere in Pulaski County will be substantially damaged.

### 8.

With further reference to bad faith on the part of the defendant, the Court finds that the defendant was organized as a Tennessee corporation in October of 1947 and commenced operations in Shelby County, Tennessee, in which the City of Memphis is located, in January of 1948. At the time of such organization, defendant's organizers knew of the existence of the Beneficial Group and that said Group was operating in a large number of states under the name of Personal Finance Company. Said organizers also knew that prior to 1937 certain members of the Beneficial Group had operated in several cities in Tennessee, including Memphis, under the name of Personal Finance Company. Said organizers also knew, however, that no operations had been conducted in the State of Tennessee by the Group since 1937, and that no member thereof was operating in Tennessee at the time the defendant was incorporated. The name, Personal Loan & Finance Corporation, was suggested as

the corporate title of the defendant by its President, Mr. Sturm; the name was adopted because of the fact that it was descriptive of the business in which the defendant proposed to engage and not for the purpose of leading the public to believe that the defendant was a member of the Beneficial Group or for the purpose of taking advantage of any good will which said Group or its members may have acquired by reason of its previous operations in the State of Tennessee. The adoption of its corporate name by the defendant was done in good faith.

From late in 1949 and continuing up until the late Spring of 1951, the Beneficial Group through a firm of attorneys located in Chattanooga, Tennessee, negotiated with the defendant and its attorneys for the purchase of the defendant's corporate name. In the course of these negotiations and on May 29, 1951, the defendant's attorney advised one of the Beneficial Group's attorneys that the defendant proposed to open a branch office in Little Rock, Arkansas; and, on June 8, 1951, the defendant's attorney wrote a letter to said attorney of the plaintiffs advising him that the defendant was going on with its plans to open a branch office and that it planned to open the same about July 1, 1951. By reason of said conversation the Beneficial Group was on May 29, 1951 put on notice that defendant intended to operate in Arkansas under Act 203 of 1951.

On July 3, 1951, the attorney for the plaintiffs mailed a registered letter to the defendant's agent for service of process in Arkansas advising him that if the defendant attempted to operate in Arkansas under its corporate name and attempted to use the words "personal" and "finance" in its advertising, the plaintiffs would seek to restrain such action. As stated, at the time this letter was written plaintiffs knew that the defendant proposed to operate in Arkansas under its corporate name.

The Court finds that the passage of Act 203 of 1951 opened up the State of Arkansas as a new field for the operations of small loan companies, and that the plaintiffs on the one hand, and the defendant on the other hand, entered the State of Arkan-

sas in good faith for the purpose of operating under said Act. The defendant did not determine to do business in Arkansas under its corporate title or to use the word "personal" in association with "finance" and "loan" in its advertising and literature with any intent to deceive the public into a belief that it was a member of the Beneficial Group or to take advantatge of any good will which had been acquired by the operating plaintiffs.

### B.   Conclusions of Law

#### 1.

The Court has jurisdiction of this cause and of the parties hereto.

#### 2.

The defendant is entitled to operate a small loan business under Act 203 of 1951 under its corporate name throughout Pulaski County, Arkansas, and to use the word "personal" in association with the words "loans" and "finances" in its advertising and literature within said county, and the plaintiffs are not entitled to an injunction preventing it from so doing.

#### 3.

Since the defendant is not doing business within any of the counties in which any of the operating plaintiffs are engaged in business, other than Pulaski County, Arkansas, and has no present intention of so doing, the plaintiffs are entitled to no injunction with respect thereto; provided, however, that should the defendant attempt to do business under its corporate name in any of the counties other than Pulaski in which any of the operating plaintiffs are now doing business, the decree herein should be without prejudice to plaintiffs' right to institute proper proceedings to enjoin such action.

#### 4.

The plaintiffs are entitled to a decree restraining the defendant from employing or using, and from continuing to employ or use, any sign, poster, literature, or advertising in which the word "personal" is written or printed in script imitative of the distinctive script in which said word

appears on the signs and logotypes and in the literature and advertising of the operating plaintiffs, subject to the provisions of Conclusion of Law No. 2 herein.

### 5.

The defendant is not entitled to any relief on its cross complaint, and said cross complaint should be dismissed.

### C. Comment.

This is an action brought by the plaintiffs named in our Finding of Fact No. 1, supra, against the defendant, Personal Loan & Finance Corporation, to enjoin the latter from engaging in the small loan business in Arkansas under its corporate name, and to further enjoin it from using the word "personal" in association with the words "loans" and "finance" in its advertising and literature. The defendant has denied that the plaintiffs are entitled to the relief sought, and in a counterclaim alleges that it is entitled to have the operating plaintiffs enjoined from doing business in Arkansas under their several corporate names, each of which has the words "Personal Finance Company" as an integral part thereof, and to have them further enjoined from using the word "personal" in association with "loans" and "finance" in their advertising and literature. Each side contends that as of the date of the filing of this action, as well as prior thereto, it had acquired the exclusive right to use the word "personal" as part of a trade name and the exclusive right to use said word in association with "loans" and "finance" in its advertising and literature; each further contends that such are property rights which a court of equity will protect.

██ Both plaintiffs and defendant base their claims upon the doctrine of "secondary meaning", which doctrine is a well settled one in the law of unfair competition and has been recognized in Arkansas; Liberty Cash Groceries, Inc., v. Adkins, 190 Ark. 911, 82 S.W.2d 28; Fine v. Lockwood, 179 Ark. 222, 14 S.W.2d

1109. See, generally, Beneficial Industrial Loan Corporation v. Kline, 8 Cir., 132 F.2d 520; Katz Drug Co. v. Katz, 8 Cir., 188 F.2d 696, affirming Katz Drug Co. v. Katz, D.C.Mo., 89 F.Supp. 528; Western Auto Supply Co. v. Knox, 10 Cir., 93 F.2d 850; Local Loan Co. v. Local Finance Corporation, D.C.Wisc., 56 F.Supp. 658; for other cases dealing with the doctrine see annotation in 150 A.L.R. 1067 et seq.

██ Since the jurisdiction of this court has been invoked solely on the ground of diversity of citizenship, Arkansas law governs. Jewel Tea Co. v. Kraus, 7 Cir., 187 F.2d 278, 282; Cook Paint & Varnish Co. v. Cook Chemical Co., D.C.Mo., 85 F.Supp. 257; General Finance Loan Co. v. General Loan Co., 8 Cir., 163 F.2d 709, 712; Katz Drug Co. v. Katz, D.C. Mo., 89 F.Supp. 528, 532; Lockwood v. Friendship Club, D.C.Md., 95 F.Supp. 614, 617. The Arkansas cases, supra, however, indicate that the law in this state with respect to secondary meaning does not differ from the general law on that subject.

██ For a definition of the doctrine of secondary meaning see 63 Corpus Juris, "Trade-Marks, Trade Names, and Unfair Competition", Section 102, page 393; this definition was approved by the Court of Appeals for this Circuit in Beneficial Industrial Loan Corporation v. Kline, supra.[1] Corpus Juris says that words or names which have a primary meaning of their own, such as words that describe the type of goods sold or the type of business engaged in, may, by long use in connection with the goods or business of a particular individual or organization, come to be understood by the public as designating the goods or business of that individual or organization; that such words have both a primary and a secondary meaning; that in their primary sense they may be used by all the world and no one has a right to appropriate them, but they must be used in such a way as not to falsely convey the secondary meaning, for this

---

1. The Beneficial Industrial Loan Corporation was the corporate predecessor of Beneficial Loan Corporation, one of the plaintiffs in the instant case. In the cited case, as here, the Beneficial Group of small loan companies was involved.

would "constitute unfair competition as tending directly to pass off the goods or business of one man as and for that of another." The text goes on to say: "This is what is known as the doctrine of secondary meaning, and its perception by the courts was the genesis of the law of unfair competition as distinguished from technical trade marks. In all this class of cases where the word, name, or other mark or device is primarily *publici juris,* the right to relief depends upon the proof. If plaintiff proves that the name or word has been · so exclusively identified with his goods or business as to have acquired a secondary meaning, so as to indicate his goods or business and his alone, he is entitled to relief against another's deceptive use of such terms, but if he fails in such proof, he is not entitled to relief."

Whether or not a given name or word has acquired a secondary meaning is a mixed question of law and fact, with the factual aspects predominating. Each case must be decided on its own facts. Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299; Little Tavern Shops v. Davis, 4 Cir., 116 F.2d 903; King Pharr Canning Operations v. Pharr Canning Co., D.C.Ark., 85 F.Supp. 150; Derenberg, "Trade-Mark Protection and Unfair Competition," page 337, cited in 150 A.L.R. 1067, 1082. The burden of showing secondary meaning in the case at bar is on the plaintiffs upon their complaint and on the defendant upon its cross complaint. 150 A.L.R., 1067, 1078 and cases there cited. See also Katz Drug Co. v. Katz, D.C.Mo., supra.

As set forth in our findings of fact, all of the operating plaintiffs are wholly owned subsidiaries of Beneficial Loan Corporation, a holding company. This corporation likewise owns all of the capital stock in 338 other operating small loan companies doing business in 35 states of the Union, besides Arkansas, and all of the stock in still other operating companies in the Dominion of Canada. All of the operating companies have similar corporate names, which are as follows: "Personal Finance Company of ———", the blank space being occupied by the name of the geographical loca-

tion, such as a city or state. These operating companies, including the operating plaintiffs in this case, wholly owned by Beneficial, and centrally managed through the Beneficial Management Corporation (another wholly owned subsidiary of Beneficial), form one of the largest, if not the largest, chains or groups of small loan companies in the United States. The chain maintains 503 separate offices in this country. It makes loans to individuals and also purchases installment contracts from merchants in the various localities where it operates. It employs a total of 4,090 individuals. In 1950 it had 1,193,588 accounts, and did a volume of business amounting to $316,390,109; at the end of that year it had upon its books $207,494,743 in notes and accounts receivable.

The Group has always advertised extensively in the localities in which it has done business; in its advertising it employs classified and display ads in newspapers, direct mail advertising to customers and prospective customers, and "throw-away" material consisting of broadsides and pamphlets intended to be distributed from door to door in the cities in which it operates; it also makes available in its various offices numerous pamphlets and booklets to be given to customers and prospective customers. Another method of business promotion and advertising employed by the Group, which is claimed to be unique in the small loan field, is a "credit card" system, under which its customers with satisfactory credit can obtain loans, under certain conditions, at any Personal Finance Company office in the United States. Plaintiffs claim that these credit cards not only enable the holders to secure funds while away from home, but also furnish identification for the holders and tend to establish their credit at hotels and other business establishments. The Group likewise distributes calendars among its customers and prospective customers. It also circulates among railroad men, where it is doing business, time books, which are intrinsically valuable and contain information · of importance to railroad workers; these time books naturally con-

tain considerable advertising matter. The evidence shows that still other methods of advertising are employed, but we consider those mentioned the most important.

The volume of the advertising of the Group is demonstrated by the fact that in 1950 alone it spent $2,802,529 for advertising, and that between 1926 and 1950 its advertising expenditure amounted to $31,201,879. Between June 4, 1951 and September 1, 1951 the Group advertised in 538 newspapers having a circulation of 37,643,099, including 7 newspapers in Arkansas with a circulation of 268,618. In 1950, 17,475,000 pieces of direct mail advertising were sent to current and old customers. Advertisements are carried in the classified section of 591 telephone directories throughout the country.

As stated, the Beneficial Group is managed through the Beneficial Management Corporation, and the operations of the various member companies are closely integrated by the managing corporation. The organization and policies of each of the operating companies are identical throughout the country, and the advertising of the various companies is uniform and is prescribed by the advertising staff of the Beneficial Management Corporation. Samples of newspaper advertising, introduced in evidence, show the practical identity of this advertising for each of the operating plaintiffs. Another example of such integrated operation is found in the procedure followed when the office of a new Personal Finance Company is opened. Upon such opening, the local manager screens the city directory to eliminate those sections of the city the inhabitants of which are not considered desirable customers, and the screened directory is then sent to the Beneficial Management Corporation, which mails advertising material to the prospective customers in such city; some, if not all, of these prospects receive a so-called "cash loan certificate", which, prima facie at least, entitles them to borrow a specified sum of money from the local company. Another such example is found in the fact that when a customer moves from one city where the Group does business to another such city, his account is trans-ferred with him, the corporation doing business in the latter city buying the account or note from the corporation which originally held it.

In all of its advertising and business practices the Group seeks to impress the borrowing public that its operations are characterized by honesty, fair dealing, efficiency, speed, and sympathetic understanding of the needs of borrowers and prospective borrowers; customers and prospective customers are assured that their transactions will be kept confidential, and they are further assured that an application for a loan will probably be granted. In this connection the Group lays emphasis in its advertising on the fact that four out of five applications are approved, and it sometimes refers to a local manager as a "Yes Man" or "Yes Manager."

While the Group seeks to increase its business, which it can do only by making loans, at the same time it points out in its literature the undesirability of unnecessary borrowing and the value of budgeting and thrift. In line with this policy it furnishes as part of its advertising material pamphlets on household budgeting and saving; these pamphlets contain forms and blank spaces in which families can work out budgets and keep a record of income and expenditures. Readers of this literature are informed that the local manager of the Personal Finance Company will be glad to introduce them to a bank if they desire to open a savings account.

Throughout all of this advertising, great emphasis is laid on the word "personal", the word over which the parties are contending here. The purpose of this emphasis is to identify the Group in the minds of the borrowing public with the word "personal" when used in connection with small loans; in other words, to invest the adjective "personal" which, in its primary sense, is a generic term descriptive of the business in which the Group is engaged, along with its competitors, with a secondary meaning indicating the Group to the borrowing public.

In furtherance of this purpose the word "personal" is given great prominence in the advertising matter of the Group, being re-

peated again and again; not only is it emphasized by repetition, but it is printed, almost invariably, in a distinctive and eye-catching script in contrast with the ordinary print in which the remainder of the text of the advertising is written.[2] The Group has registered with the United States Patent Office a number of "service marks", almost all of which prominently display the word "personal" written in script. The emphasis on "personal" appears not only in the Group's literature and advertising matter, but also in the neon signs and logotypes which are placed at the various offices of the operating companies; in these signs and logotypes the word invariably appears in script.

■■■■ The high standard of operation, as shown by the evidence, and the volume and obvious effectiveness of the Group's advertising material have no doubt built up valuable good will for it in areas where its members were doing business prior to its entry into Arkansas in 1951, and in those areas where it has been operating for a substantial period of time and word "personal" may have acquired a secondary meaning. That, however, is not the question before us. What we are to decide is whether or not on or before August 24, 1951, the date of the filing of the plaintiffs' complaint herein, said word had acquired a secondary meaning *in Arkansas* which would entitle the plaintiffs to the relief sought. The fact that a trade mark or trade name may have acquired a secondary meaning in one locality does not mean that it has acquired such meaning in an entirely different trade area where the public is unfamiliar with such name or mark. Liberty Cash Groceries, Inc., v. Adkins, supra; Fine v. Lockwood, supra; Katz Drug Co. v. Katz, both decisions, supra; Griesedieck Western Brewery Co. v. Peoples Brewing Co., 8 Cir., 149 F.2d 1019, 1022; Beneficial Industrial Loan Corporation v. Allenstein, 5 Cir., 173 F.2d 38; Schwartz v. Television Center, D.C.Cir., 189 F.2d 691, 692. In the case last cited the Court quoted with approval from Nims,

"Unfair Competition," 3d Ed., Section 37, where it is said: " 'Secondary meaning is *association,* nothing more. It exists only in the minds of those of the public who have seen or known or have heard of a brand of goods by some name or sign and have associated the two in their minds.' "

■■■■ We are unable to find from a preponderance of the evidence that on or prior to said date the word "personal" had acquired in Arkansas the secondary meaning contended for by plaintiffs, however the case may have been in other states where the Group had been doing business for a substantial period of time.

The advertising campaign of the Group, while extensive and well conceived, has been essentially local in its nature and has been aimed at borrowers and prospective borrowers in the localities where the Group has actually been doing business. As stated, the Group did not come into Arkansas until the late spring and summer of 1951, and prior to that time it did no advertising in Arkansas; and such advertisements, if any, that Arkansas people may have happened to see were not directed at them and cannot be presumed to have made any particular impression on their minds.

This essentially local nature of the Group's advertising is demonstrated by the fact that only 1.36% of its advertising budget is allocated to national advertising. There has been no extensive advertising in magazines or newspapers having a nationwide circulation; the plaintiffs did exhibit some advertisements which had appeared in Good Housekeeping nine or ten years ago, and also one which had appeared in Time during 1942, but the Vice President of the Beneficial Management Corporation, who has charge of all of the Group's advertising, testified that national advertising does not play a major role in its advertising scheme, and that it does not advertise extensively on a national basis.

Prior to its operations in Arkansas the Group did not advertise in any Arkansas newspapers, and there is no showing that

---

2. The script form of "personal" is not used in classified newspaper ads since the newspapers will not ordinarily print a classified ad in distinctive print but insist on using the ordinary forms. The script is used in display ads, however.

any substantial number of Arkansans ever saw its advertisements appearing elsewhere, or that any Arkansas people were particularly impressed with such advertising if they did see it. There was no direct mail advertising addressed to people in Arkansas prior to June of this year. With respect to the railroad time books, it is admitted that none of these had been directly circulated in Arkansas up to the date of trial, and there is no satisfactory evidence that such books had gotten into the hands of any Arkansas railroad employees.

There was no direct evidence that the word "personal" had acquired a secondary meaning in Arkansas prior to the time that the Group came into the State. On the other hand, Mr. Thomas Hayes, who was Manager of the personal loan department of the Union National Bank of Little Rock from 1944 to 1949, testified that during those years he never heard of the Group. The fact that a man who was so intimately connected with the small loan business in Arkansas for such period of time had never heard of the chain is evidence that the general public in Arkansas had never heard of it either.

It is true that on June 4, 1951 the Group began operations in Little Rock, North Little Rock, and Pine Bluff and from that time on it was advertised in the State by most of the methods which have been mentioned, but we cannot say that in the short time which elapsed between June 4 and August 24, less than three months, the name "Personal" acquired a secondary meaning either in Little Rock, North Little Rock, or elsewhere in the State. In determining whether or not a trade mark or trade name has acquired such a meaning within a given trade area, the time in which it has been used in that area is the usual standard, although not controlling. Barton v. Rex-oil Corporation, 3 Cir., 2 F.2d 402, 40 A.L.R. 424; King Pharr Canning Operations, Inc., v. Pharr Canning Co., supra. The short time that elapsed between the opening of the first Arkansas offices of the operating plaintiffs and the filing of this suit renders it difficult to believe that within that period

a secondary meaning had been acquired, and this difficulty has not been overcome by the evidence. In this connection, the evidence shows only 1,165 direct loans as having been made in Arkansas by the operating plaintiffs; of these 143 were made in North Little Rock and 167 in Little Rock; 434 have been made in Pine Bluff. Between the commencement of business in Arkansas and the filing of this suit only 23 accounts had been transferred from other states to the operating plaintiffs at Jonesboro, El Dorado, Texarkana, Little Rock, and North Little Rock; the witnesses had no figures available on Fort Smith or Pine Bluff. Of these accounts, 5 were transferred to Little Rock and 4 to North Little Rock. There were only 10 applications for "credit card" loans in Arkansas between the time plaintiffs' various offices in Arkansas were opened and the time of the filing of this suit; of these applications four were filed at Little Rock and one at North Little Rock. While the total dollar volume of business done by all of the operating plaintiffs between the time business was commenced and suit was filed amounted to $320,000, a substantial sum, this figure is of little value to us in the absence of some basis of comparison, and its significance is further weakened by the fact that not all of this sum represented direct loans; some of it represented installment contracts purchased from merchants.

We do not doubt that since June 4 the operating plaintiffs have endeavored to confer the desired meaning upon the word "personal" within the State by most of the advertising methods which have been mentioned. The question, however, is not the effort which they have made, but the effectiveness of that effort. Judge Learned Hand, while still upon the district bench, in the case of Bayer Co. v. United Drug Co., D.C.N.Y., 272 F. 505, 509, said: "The single question, as I view it, in all these cases, is merely one of fact: What do the buyers understand by the word for whose use the parties are contending? If they understand by it only the kind of goods sold, then * * * it makes no difference whatever what efforts the plaintiff has

made to get them to understand more. He has failed, and he cannot say that, when the defendant uses the word, he is taking away customers who wanted to deal with him.". In DuPont Cellophane Co. v. Waxed Products Co., 2 Cir., 85 F.2d 75, 81, the Court said that the question was whether or not the plaintiff had "convert[ed] the world to its gospel" with respect to the word in controversy, and that its efforts alone toward that end were not material.

■ The plaintiffs having failed to show that the word "personal" had acquired a secondary meaning in Arkansas prior to the filing of their complaint herein, they are not entitled to a decree enjoining the defendant from operating under its corporate name in Little Rock, North Little Rock* and elsewhere in Pulaski County. Nor are they entitled to an injunction restraining the defendant from using the word "personal" in association with "loans" and "finance" in its literature and advertising. Further, plaintiffs are not entitled, in this particular case, to have the defendant so restrained elsewhere in Arkansas. However, since the filing of this action the operations of the plaintiffs and their advertising have continued and by this time the word "personal" may or may not have acquired a secondary meaning in their favor in areas in Arkansas other than Pulaski County, and should the defendant hereafter seek to expand its operations to other counties in which any of the plaintiffs are now doing business, the plaintiffs should in no way be prejudiced by the decree herein from instituting proper proceedings to enjoin such action.

■ Aside from the question of secondary meaning, there is another basis upon which the plaintiffs might have been entitled to equitable relief against the defendant, had such basis been established by the evidence:

In his carefully prepared opinion in the Katz case, Judge George H. Moore pointed out that there are two bases upon which a trade name or trade mark may be protected, one being "secondary meaning", and the other bad faith on the part of the defend-

ant. See 89 F.Supp. 528, 534. The plaintiffs here did not allege bad faith on the part of the defendant, nor was it referred to in the opening statements of counsel. The introduction by the plaintiffs of pictures of the defendant's window sign, referred to in our Finding of Fact No. 7, however, in our opinion, brought up the question of good faith on the part of the latter, and we then gave both sides an opportunity to go into the question more fully if they so desired. Neither side introduced further direct evidence on the point, however, except that the defendant produced evidence in explanation of the sign, and also evidence showing the circumstances under which its corporate name was adopted, and those under which it determined to expand its operations from Memphis, Tennessee to Pulaski County, Arkansas. The evidence last referred to satisfies us that the defendant was not guilty of any bad faith in the selection of its corporate name or in determining to operate under that name in Pulaski County, Arkansas after Act 203 of 1951 was passed.

■ The defendant was organized as a corporation in October 1947 and commenced operations in Memphis and Shelby County, Tennessee in January of 1948. At that time the Beneficial Group was not operating anywhere in Tennessee, although it had done business in several cities of the latter state, including Memphis, prior to 1937. While the defendant's vice president, Mr. Brown, had previously been connected with the small loan business for several years and was familiar with the existence of the Beneficial Group, its operations in other sections of the country, and it former operations in Tennessee, he also knew that the group was not then operating in Tennessee. The defendant's corporate name was not suggested by Mr. Brown but by a Mr. Sturm, the president of the corporation, and he chose it because it was descriptive of the business in which the defendant proposed to engage and not for the purpose of leading the public to believe that defendant was a member of the Beneficial Group or of taking advantage of any good will which the Group might

have acquired by reason of its former operations in Tennessee.

Late in 1949, the Beneficial Group entered into negotiations with the defendant for the purchase of the latter's corporate name; these negotiations were conducted, on the part of the Group, by the law firm of Kefauver, Duggan and Miller of Chattanooga, and on the part of the defendant by some of its officials and by its attorneys, including Honorable James W. Watson, formerly a probate judge of Shelby County, who testified at the trial of this case. These negotiations, which did not result in a deal, were carried on throughout 1950 and up until the late spring of 1951. The fact that the Group undertook to purchase the corporate name of the defendant for a valuable consideration tends to show that it recognized that the defendant owned that name and had a right to its use. Whether these negotiations amounted to such recognition or not, however, we can find nothing in the evidence in this case to convince us that the defendant did not have the same right to come into Arkansas and do business under its corporate name that the operating plaintiffs had, so long as it did so in good faith and without any design "inimical to the interests" of the plaintiffs.

▮▮ Plaintiffs emphasize the fact that on July 3, 1951 their attorney wrote the defendant's agent for service of process in the State of Arkansas advising him that if the defendant attempted to operate in Arkansas under its corporate name and attempted to use the words "personal" and "finance" in its advertising, the plaintiffs would seek to restrain such action. This letter was written and received subsequent to the time that the defendant had qualified to do business in Arkansas as a foreign corporation but prior to the time that it had applied to the State Bank Department for a license to engage in the small loan business under Act 203 of 1951. The fact that this notice or warning was disregarded by the defendant does not in any way convict it of bad faith in our eyes. In this connection, as pointed out in our Findings of Fact, on May 29, 1951 in the course of the negotiations for the purchase of the defendant's corporate name, Judge Watson informed Mr. Mayne W. Miller, one of the attorneys for the Group, that the defendant proposed to enter Arkansas and to open an office in Little Rock. On June 8, 1951 Judge Watson wrote Mr. Miller that the defendant was going forward with its regular plan in this regard. In the course of this letter he said: "I think you will agree that we should not just close up until your client decides to discuss the matter further. You will recall that I advised you on your trip to Memphis that we would open a branch office July 1st., and the final arrangement as to the name cannot wait much longer if we are to meet that opening date." It thus appears that prior to the time the plaintiffs sent their letter of July 3 to the defendant's agent for service, they had notice that the defendant was planning to come into Arkansas and to operate there under its corporate name.

We do not believe that there has been any fraud or bad faith on the part of either side in this case; on the contrary, we are impressed by the high standing and good faith of both the plaintiffs and the defendant. The passage of Act 203 of 1951 opened up the State of Arkansas as new territory for the operations of small loan companies such as the parties to this litigation, and both sides in this case were anxious to move into that territory. Both came in for the same reason, the passage of Act 203.

▮▮ We are of the opinion, however, that it would be unfair to permit the defendant to portray the word "personal" in its signs or in its literature and advertising in script imitative of that so used by the Beneficial Group; and the defendant will be enjoined from so doing.

▮▮ Little need be said with respect to the defendant's counterclaim. There is no evidence that the defendant has ever done any business in Arkansas, even in Eastern Arkansas. Its operations have been confined to the City of Memphis, and its immediate vicinity. It is true that it has advertised in two Memphis newspapers, the "Commercial Appeal" and the "Press-Scimitar", both of which have a considerable circulation in Eastern Ar-

852

kansas, but there is no evidence that the defendant's advertising was calculated to, or did, have any effect upon the minds of the borrowing public even in Eastern Arkansas. Moreover, there is no showing that either of said papers has a substantial circulation in Little Rock or North Little Rock, where the defendant proposes to operate. The counterclaim will be dismissed.

Let each side in this case bear its own costs and let a decree be entered in accordance with the foregoing.