**RAXTON CORPORATION, d/b/a Off the Rax, Plaintiff, Appellee,**

v.

**ANANIA ASSOCIATES, INC., d/b/a Off the Rack, Defendant, Appellant.**

**No. 80–1159.**

United States Court of Appeals, First Circuit.

Argued Sept. 8, 1980.

Decided Dec. 11, 1980.

tality and dimension of the doctrine of the "zone of natural business expansion."[1] That doctrine is said to grant the owner of a trademark the right to obtain legal relief against a geographically distant party that subsequently adopts a confusingly similar mark, so long as the first user can show that the distant location is within its "natural zone of expansion". We reverse the judgment below and hold that this doctrine does not apply when the first user failed to register the mark and the second party, innocent of any knowledge of a first use, adopted a name new to the area.

## I.

Plaintiff appellee ["Rax"] sells women's clothing at a discount store called "Off the Rax" in the vicinity of Norwood, Massachusetts. Defendant appellant ["Rack"] sells men's clothing at a discount store called "Off The Rack" in Brockton, Massachusetts. The parties agree that the names are confusingly similar. The district court found that each adopted its name in good faith and without knowledge of the other's usage.

The sequence of events leading from the choice of names to the discovery of the conflict is compressed in time. Rax was organized as a wholly-owned subsidiary of Stop & Shop Companies, Inc. in May 1978. It is a Massachusetts corporation headquartered in Norwood, Massachusetts. It chose its name and leased space for a warehouse and office in Norwood in the summer of 1978, intending first to lease a large enough facility to permit it to open a warehouse store at the same location. This effort, however, was stymied for about a year by the unavailability of an adequate area for store parking. Although it had made private sales to employees from its Norwood warehouse, Rax did not sell to the public or advertise in Massachusetts until it opened a store near its Norwood warehouse in Au-

Steven J. Henry, Boston, Mass., with whom John F. McKenna, and Cesari & McKenna, Boston, Mass., were on brief, for defendant, appellant.

Henry C. Nields, Boston, Mass., with whom David A. Tucker, and Russell & Nields, Boston, Mass., were on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, KEETON, District Judge.*

COFFIN, Chief Judge.

This appeal concerns the geographic scope of trademark protection accorded to a plaintiff in the absence of state or federal trademark registration. At issue is the vi-

---

* Of the District of Massachusetts, sitting by designation.

1. This case involves no consideration of the "natural expansion" doctrine as it concerns *product* rather than geographic markets. *Cf.* *W. E. Kautenberg Co. v. Ekco Products Co.,* 251 F.2d 628, 631, 45 CCPA 761 (1958) (discussing product market "natural expansion of business" doctrine).

gust 1979. Rax opened the first of its stores in New Jersey and Illinois in September 1978. By December 1978 it had opened twelve stores in the Chicago and Philadelphia areas. It succeeded in opening ten more stores in these areas and around Washington, D.C., in 1979. It stated that it planned to open an additional 30 stores in 1980.

Rax made one use of the now–disputed name in Massachusetts before learning of Rack's use of the name there. On August 3, 1978, the following article appeared in the "In Brief" section of the *Boston Globe* newspaper:

Women's Shops

Avram J. Goldberg, president of the Stop & Shop Companies, Inc., yesterday announced that its new venture of women's specialty shops will be known as Raxton Corp., a wholly–owned subsidiary of The Stop & Shop Companies doing business as "Off the Rax." [2]

Rack is also a Massachusetts corporation. Its principals did not incorporate until June 1979, although they did business together prior to this time. They chose the Rack name in December 1978, and advertised it for the first time the following month on a large notice announcing their projected opening at the Brockton site–their lone store. On February 1, 1979, Rack obtained registration of its name as a trademark and a service mark from the Secretary of the Commonwealth of Massachusetts. Rack installed a permanent sign at its Brockton location that same month. On February 27, 1979, a salesman who had had prior dealings with Rax notified Rack of Rax's existence. In March 1979 Rax sent to Rack by certified mail a formal objection to Rack's use of the name. Rack made its first sale on March 15, 1979, and opened to the public on April 2, 1979. It began local radio and newspaper advertising about the same time. In July, Rax filed its complaint, alleging false desig-

nation of origin, false description, and false representation in violation of 15 U.S.C. § 1125(a) (The Lanham Act § 43(a)), and also trademark infringement and unfair competition under common law.

Rax has not registered its mark with Massachusetts. Neither party had received federal registration at the time of oral argument, although Rax announced at that time that it had applied for federal registration and was awaiting action by the federal government.[3]

The district court began its analysis by noting the principle that priority of use governs the conflicting trademark claims in this suit. It noted that Rax had the first use of the mark in Chicago and in Philadelphia, but it ruled that Rax's Massachusetts activities prior to its August 1979 advertising and store opening were not sufficient to establish its trademark rights there on that basis alone -a finding that Rax does not challenge in this court. However, it held that Massachusetts was "a target area for expansion of [Rax's] stores" by reason of Rax's maintenance of its executive warehouse within the state; its announcements of its name to the newspapers and to its stockholders; its prior sales to its employees; its plan from the beginning of its operations to open a store near its warehouse and to extend the retail chain into Massachusetts within three or four years; its Massachusetts corporate citizenship (as well as that of its parent corporation); and finally, by virtue of the fact that its parent operates numerous other (Stop and Shop) stores within the state. It concluded that Rax, "admittedly the prior user, although in another market, is thus entitled to protection also in Massachusetts, the area of its natural and probable expansion. *Hanover Star Milling Company v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916)." The court then granted Rax's prayer for a per-

---

**2.** Rax also announced its name in a single sentence in its stockholders report of September 11, 1978. Approximately 3100 of these reports were sent to Massachusetts residents.

**3.** Federal trademark registration takes effect when the Patent and Trademark Office issues a certificate of registration. *See* 15 U.S.C. § 1057(b).

manent injunction against Rack's use of the name and denied Rack's prayer.[4]

## II.

■ We note at the outset that we have both federal question and pendent jurisdiction over the questions presented in this appeal.[5] Considering next the propriety of the district court's judgment on the grounds of federal unfair competition law under § 43(a) of the Lanham Act, we observe that our first task must be to determine the proper contours of the "natural expansion doctrine" that it applied. This doctrine appears singularly imprecise. Its origin is most commonly attributed to the Supreme Court decision in *Hanover Star Milling Company v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), the sole authority that the district court cited for its decision. In part of that case the Supreme Court decided the respective trademark rights of two companies that had both adopted in good faith the mark "Tea Rose" for flour. Allen & Wheeler had adopted the name first, but had confined its trade to areas other than the southeastern United States, the area about which rights to the names was disputed. Hanover was the subsequent good faith user, and had established its trade in the southeast.

Because of the distinctness of the market areas, the Court ruled that Allen & Wheeler's prior appropriation was "legally insignificant", since the second adopter had not "selected the mark with some design inimical to the interest of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like." 240 U.S. at 415, 36 S.Ct. at 361. The Court stated that the owner of a trademark cannot

"monopolize markets that his trade has never reached .... 'Since it is the trade, and not the mark, that is to be protected, a trade–mark .... of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article.' " 240 U.S. at 416, 36 S.Ct. at 361 (quoting from the opinion below).

The only discussion of a "natural expansion doctrine" occurred in a single sentence: "We are not dealing with a case where the junior appropriator of a trade–mark is occupying territory that would probably be reached by the prior user in the natural expansion of his trade, and need pass no judgment upon such a case." *Id.* at 420, 36 S.Ct. at 363.

Two years later the Court reiterated *Hanover's* principle that a trademark "right grows out of use, not mere adoption" of the trademark. *Id.* at 413, 36 S.Ct. at 360. In *United Drug Co. v. Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918), the petitioner first used the trademark "Rex" in connection with medicinal preparations in Massachusetts. About six years later, a druggist in Kentucky began using the same term–without knowledge of the petitioner's prior use–to market a "blood purifier" in Kentucky. Later the Massachusetts user sent "Rex Dyspepsia Tablets" to Kentucky for retail sale. The Court ruled that the subsequent Kentucky user had rights to the Rex name in Kentucky:

"The owner of a trade–mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly .... In truth, a trade–mark confers no monopoly whatever in a proper sense, but is merely a convenient means for facilitating the protection of one's good–will in trade by

**4.** Rack had counterclaimed for trademark infringement and unfair competition under common law and Massachusetts statutes M.G.L. c. 93A & 110 and for violation of 15 U.S.C. § 1125(a).

**5.** Both parties are suing under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which "creates a federal law of unfair competition by providing a statutory remedy for a party aggrieved by a competitor's 'false designation of

origin' of his product, even though he does not have a federally registered trademark." *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir. 1980). The state law infringement and unfair competition claims, which arise out of the identical facts and relate to the identical parties, receive pendent federal jurisdiction under 28 U.S.C. § 1338(b). *E. g., DCA Food Industries Inc. v. Hawthorn Mellody, Inc.*, 470 F.Supp. 574, 582 (S.D.N.Y.1979).

placing a distinguishing mark or symbol–a commercial signature–upon the merchandise or the package in which it is sold.

It results that the adoption of a trademark *does not*, at least in the absence of some valid legislation enacted for the purpose, *project the right of protection in advance* of the *extension of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade.*" 248 U.S. at 97–98, 39 S.Ct. at 50–51 (emphasis added).

These two cases are key because they "crystallized the law, and prior learning, so far as the federal courts are concerned, be[came] of negligible value." *Sweet Sixteen Co. v. Sweet "16" Shop*, 15 F.2d 920, 922 (8th Cir. 1926). And although both cases apparently were decided as matters of state rather than federal law, *see Hanover*, 240 U.S. at 411, 36 S.Ct. at 359; *id.* at 425, 36 S.Ct. at 365 (Holmes, J., concurring); *Hanover Star Milling Co. v. Allen & Wheeler Co.*, 208 F. 513, 523 (7th Cir. 1913); *Rectanus, supra*, 248 U.S. at 98–99, 39 S.Ct. at 51, they are relevant to the scope of the federal tort here at hand. "Prior to *Erie Railroad Co. v. Tompkins* ... when the jurisdiction of a United States court was invoked in trade–mark cases, it was not customary or necessary to distinguish nicely as to what rule of law was applicable." *National Fruit Product Co. v. Dwinell–Wright Co.*, 47 F.Supp. 499, 501 (D.Mass. 1942). "And [though] this section [43(a) of the Lanham Act] created a new federal statutory tort, pre–Lanham Act decisions based on the federal common law of unfair competition [are] suggestive, [although] not controlling." *Keebler Co. v. Rovira Biscuit Corp., supra*, 624 F.2d at 373.

Were we to face the case at bar with the guidance of only these two decisions–which are in fact the latest Supreme Court considerations of the problem–we should think ourselves bound to reverse the decision of the district court. Although the relevant events are closer in time than in either *Hanover* or *Rectanus*, the facts as determined by the district court reveal an essentially similar situation here. Rax was the prior user in the remote Philadelphia and Chicago locations. Although it had significant *managerial* links with Massachusetts, the district court found that it did not have sufficient contacts to establish prior use of its *name* there. Rack adopted in good faith what amounted to a new name in Massachusetts, without notice of Rax's choice and without intention to trade upon Rax's reputation. Although the timing of the case is very close, what could otherwise be a troubling issue seems settled by the fact that Rack in good faith obtained state registration giving "constructive notice of the registrant's claim of ownership thereof and [providing] ... prima facie evidence of the registrant's exclusive right to use the registered mark in" Massachusetts. Mass.Gen. Laws Ann. ch. 110B, § 4 (West Supp.1980–1981).

But some courts following *Hanover* and *Rectanus* have interpreted these decisions to suggest that a trademark owner *can* "monopolize markets that his trade has never reached." In 1926, one court quoted the single sentence in *Hanover* referring to "natural expansion of trade" and stated that "the instant case is within what seem to be the very plain exceptions to the general rule." *Sweet Sixteen Co. v. Sweet "16" Shop, supra*, 15 F.2d at 924 (8th Cir. 1926). The court apparently there construed the statement that the court "need pass no judgment upon such a [natural expansion] case" to read that the court indeed had passed judgment–and had decided that such a case was to be an exception to the *Hanover* rule.

Despite this expansive language, there is no doubt that the *Sweet Sixteen* court reached a proper result on its facts. The court made clear that there the subsequent user adopted in Salt Lake City the names of the San Francisco mail order dealer that had done business in Salt Lake City. The court stated that the evidence showing the subsequent user's knowledge of the prior San Francisco use of the mark in question was "suggestive, if not sinister." 15 F.2d at

924. But the court's language left the possibility that the natural expansion "exception" was to be considered a doctrinal category apart from the key factor of the subsequent user's bad faith adoption of a mark with preexisting commercial significance in the subsequent user's geographic area.[6]

In 1938 the American Law Institute contributed to this gratuitous doctrinal development in the first Restatement of Torts.[7] Section 732 provided:

> "The interest in a trade–mark or trade name is protected ... with reference only to territory from which he receives or, *with the probable expansion of his business, may reasonably expect to receive* custom in the business in which he uses his trade–mark or trade name, and in territory in which a similar designation is used for the purpose of forestalling the expansion of his business." (Emphasis supplied.) [8]

One court later noted that the Restatement's language left the possibility that "even in the absence of bad faith, protection is to be given a mark in territory in which the mark is unknown, as against an innocent appropriator." *Katz Drug Co. v. Katz*, 89 F.Supp. 528, 535 (E.D.Mo.1950), aff'd, 118 F.2d 696 (8th Cir. 1951). In a comprehensive opinion, that court said that "[i]f this interpretation is correct, it is my opinion that the Restatement here is not supported by case law." 89 F.Supp. at 535. It stated:

"A number of cases have been cited by plaintiff's counsel in support of the field of natural expansion theory. It is readily seen that these cases do not require the plaintiff to show competition or loss of trade in order to obtain injunctive relief; but it is also apparent that in these cases there was present a showing of one of the following facts: either (1) that the junior appropriator adopted the senior user's mark with a 'design inimical to the interests' of the latter, that is, adopted it in bad faith; or (2) that the senior user, at the time of the adoption of the mark by the junior user and in the territory in which the junior user employed the mark, had something variously denominated by different courts as 'secondary meaning', 'good–will' or 'reputation'. [Citing cases] ... The plaintiff argues only that in 1933 it would, in the natural expansion of its business enterprise, eventually have established a store in [the disputed area], and was at the time negotiating for the location of the store. I have found no case saying that alone is sufficient to entitle it to protection." *Id.* at 534–35.

Since this time, a number of courts have reiterated *Katz's* limiting view of the "natural expansion" doctrine. *See Shoppers Fair of Arkansas, Inc. v. Sanders Co.*, 328 F.2d 496, 500–01 (8th Cir. 1964); *beef & brew, inc. v. Beef & Brew, Inc.*, 389 F.Supp.

---

6. Similar seeds were sown in several other federal cases that reached defensible results by means of unnecessary endorsements of the "natural expansion" doctrine. *Terminal Barber Shops v. Zoberg*, 29 F.2d 807, 809 (2d Cir. 1928) (reference to "business promised to [the plaintiff] by normal expansion", despite finding that plaintiff advertised "extensively" in the subsequent user's area and the "defendants are unquestionably attempting to benefit by the reputation of the plaintiff"); *White Tower System, Inc. v. White Castle System of Eating Houses Corporation*, 90 F.2d 67 (6th Cir. 1937) (Detroit found to be "within the normal scope of expansion of appellee's business", but, in addition, appellee found to have "substantial good will in that city" and appellant found to have "deliberately imitated the peculiar characteristics of appellee's business, and adopted its system [in an effort] to exclude appellee from using its own style of building, name, and slo-

gan in Detroit upon the ground that appellant first did business in that city"); *see also Western Oil Refining Co. v. Jones*, 27 F.2d 205 (6th Cir. 1928) (court chose to "pass" evidence of subsequent user's "intended deception" and instead placed holding on the ground of the "normal expansions of the business").

7. The Restatement Second omitted the chapters on unfair competition and trade regulation since they had become independent bodies of law by that time. Restatement (Second) of Torts, Introductory Note to Division Nine (1979).

8. In the accompanying *Comment a*, reference is made without explanation for delimitation of protection of a trademark in a territory where there is a "probability" that it will become known.

179, 185 (D.Ore.1974); *cf. Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 310 F.2d 156, 162–63 (4th Cir. 1962) ("The existence or non–existence of good faith on the part of the second user of the trade name is a powerful factor in determining whether the name is entitled to protection in an area to which the business it identifies has not actually extended."). But other courts have referred to the "natural expansion" doctrine in terms that suggest that they believe its key focus to be the commercial growth plans of the first user rather than whether the second user adopted an unknown mark in good faith–that is, without an intent to benefit from preexisting consumer goodwill developed by another. *E. g., Value House v. Phillip Mercantile Co.*, 523 F.2d 424, 431 (10 Cir. 1975) (dicta). We observe, however, that in none of the cases cited by the parties before this court has a court applied the "natural expansion" doctrine to bar a party from adopting a trademark in good faith merely on the ground that that user lay in the "natural expansion path" of a prior appropriator from a remote area. *See Wiener King, Inc. v. Wiener King, Corp.*, 192 U.S.P.Q. 353 (3d Cir. 1976); *Shoppers Fair of Arkansas, Inc. v. Sanders Co., Inc., supra*, 328 F.2d at 496; *beef & brew, inc. v. Beef & Brew, Inc., supra*, 389 F.Supp. at 179; *Southland Corp. v. Schubert*, 297 F.Supp. 477 (C.D.Cal.1968); *Sterling Brewing, Inc. v. Cold Spring Brewing Corp.*, 100 F.Supp. 412 (D.Mass.1951); *Drug Fair–Community Drug Co. v. Drug Fair, Inc.*, 180 U.S.P.Q. 278 (Pa.Sup.Ct.1973).

This absence is understandable. A "natural expansion" doctrine that penalized innocent users of a trademark simply because they occupied what for them would be a largely undiscoverable path of some remote prior user's expansion strikes us as at once unworkable, unfair, and, in the light of statutory protection available today, unnecessary. Such a doctrine would have to weigh the remote prior user's intangible and unregistered interest in future expansion as more important than the subsequent user's actual and good faith use of its name. Besides involving the obvious practical difficulties of defining the "natural expansion path" of a business, this doctrine would also allow trademark owners to "monopolize markets that [their] trade ha[d] never reached." *Hanover, supra*, 240 U.S. at 416, 36 S.Ct. at 361.

The unfairness of this doctrine vanishes if the hypothesis of an *innocent* subsequent user is dropped, or if it is shown that the disputed trademark is known to consumers in the area of subsequent use prior to the subsequent user's adoption.[9] In these cases it can be presumed unless demonstrated to the contrary that the subsequent user knowingly copied a mark. At the least, this suggests that the subsequent user should have been more careful to select a name free of prior rights and should be held to assume the risk of its negligence. At worst, this indicates a design to appropriate the good will of another.

If a "natural expansion" doctrine independent of a concern with the good faith of the subsequent user or the prior reputation of the mark in the contested territory ever had any place in federal law, we believe that this place could have existed only before federal statutes provided a procedure by which trademark owners could register their marks in an effort to gain preemptive protection beyond their area of actual trade. But the Lanham Act, which created the statutory tort at issue in this suit, also provides a comprehensive registration procedure establishing preemptive rights to the extent that Congress thought desirable.

9. *See* Note, *Developments in the Law: Trademarks and Unfair Competition*, 68 Harv.L.Rev. 814, 858–59 (1955) ("[N]otice is the determinative factor, usually sufficient in itself to bar the second user's claim. Of course such willfulness might well serve as evidence that the first user's mark, at least in reputation, has extended to the new area."); Marks, *Trademark Protection Under the "Natural Area of Business Expansion" Doctrine*, 53 Notre Dame L. 869, 870 n.8 (1978) ("natural expansion" doctrine does not apply "where the subsequent user adopts and uses the mark in good faith in a territory into which the goods of the first user have not in fact, or at least without any awareness by the second user, been sold or acquired recognition").

*See* 15 U.S.C. §§ 1051 *et seq.; Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 362–65 (2d Cir. 1959); *John R. Thompson Co. v. Holloway*, 366 F.2d 108, 114–16 (5th Cir. 1966); *Sterling Brewing, Inc. v. Cold Spring Brewing Corp., supra*, 100 F.Supp. at 418. The trademark owner who ignores this statutory mechanism, or whose claim to trademark rights depends on a timing difference so close that the delay in federal registration processing is fatal, cannot be heard to complain about its failure to preempt subsequent good faith users.[10]

Here Rax's efforts to have "Off the Rax" become known in Massachusetts, before it learned of Rack's activities, could not be said to rise above a scintilla. It did not pursue federal registration nor the presumably more expeditiously obtained Massachusetts registration. It did not even utilize its headquarters office and warehouse space to publicize the name by signs or other means.

In sum, we believe that the "natural expansion" doctrine, when involved in circumstances like those at bar, is a misnomer for a legitimate concern that subsequent trademark users not be allowed to trade on the preexisting good will of others. Since Rack adopted its name in good faith, and, as the district court found, Rax had established no prior use of or reputation for the name in Massachusetts, we hold that the district court erred by employing the "natural expansion" doctrine as a matter of federal law to enjoin Rack's use of its name.

■ We turn now to the district court's holding as a pendent question of Massachusetts law. We again observe that neither the district court nor the parties before this court cited a single instance of a Massachusetts application of the "natural expansion" doctrine. Instead, Rax concedes that the one Massachusetts case that it does cite in its brief "refus[es] to apply the 'zone of expansion' theory at all." *See Kaufman v. Kaufman*, 223 Mass. 104, 106, 111 N.E. 691, 692 (1916) (trade name entitled to protection "only within the territorial boundaries where he has established his trade name by actual commercial transactions, and not outside that territory").

Our own examination of Massachusetts decisions suggests that the state courts have not altered the position expressed in *Kaufman. See Great Scott Food Market, Inc. v. Sunderland Wonder Inc.*, 348 Mass. 320, 323, 203 N.E.2d 376, 379 (1965) ("We note also, but express no view, on, [sic] the possible applicability of the doctrine of reasonably expectable expansion of business.").[11] Our federal decisions in diversity cases are consistent with this view.[12] *See Sterling Brewing, Inc. v. Cold Spring Brewing Corp.*, 100 F.Supp. 412, 416 (D.Mass. 1951) (following *Kaufman*).

---

**10.** One commentator suggests that the risk encountered from extensive delay in securing federal registration can be minimized by taking advantage of state registration. *Cf.* Cohen, *Trademarks and Trade Names in Massachusetts*, 59 Mass.L.Q. 43, 48 (1974) (state registration "might be warranted to cover the period of pendency of the federal registration").

**11.** The *Great Scott* case accords with the views expressed in this case. There the court enjoined a subsequent user who had "wrongfully assumed and appropriated the trade name 'Big G' for the purpose of appropriating for its own profit the reputation, goodwill and value connected with the plaintiff's trade name." 348 Mass. at 322, 203 N.E.2d at 378. That case quoted language of Judge Learned Hand taken from a case in which a battery manufacturer adopted the trade name used by a padlock manufacturer. In condemning the subsequent user for "borrow[ing] the [trademark] owner's reputation", this language and decision is likewise consistent with this decision. *See Yale*

*Electric Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928) (L. Hand, J.).

**12.** In *Food Fair Store, Inc. v. Food Fair, Inc.* 177 F.2d 177 (1st Cir. 1949), a plaintiff's prior use of a name elsewhere in New England was held to have achieved a secondary meaning within Massachusetts such as to warrant protection against defendant, who had acted with full knowledge of plaintiff's earlier use. We suggested that defendant appropriately modify and distinguish its name. Subsequently, in *Food Center, Inc. v. Food Fair Stores, Inc.*, 356 F.2d 775, 778 (1st Cir. 1966), in determining rights of each of the still contesting parties under the decree, we acknowledged the right of the defendant "to contemplate some expansion" under its modified name. This we read as some fine tuning of rights springing from our own decree, not as a pronouncement of an inherent right of expansion in any owner of a name.

Our review of recent Massachusetts statutory developments also dissuades us from attributing life to the "natural expansion" doctrine in Massachusetts jurisprudence. Trademark registration under Massachusetts statutes formerly gave the registrant "no right that it did not have at common law." *Gould Engineering Co. v. Goebel*, 320 Mass. 200, 206, 68 N.E.2d 702, 706 (1946); *Jackman v. Calvert–Distillers Corp.*, 306 Mass. 423, 425, 28 N.E.2d 430, 432 (1940). But in 1973 Massachusetts added chapter 110 B to its trademark laws. *See generally* Cohen, *Trademarks and Trade Names in Massachusetts*, 59 Mass.L.Q. 43 (1974). Section 4 of that chapter provides in part that

> "[r]egistration of or renewal of a mark provided by this chapter shall be constructive notice of the registrant's claim of ownership thereof and shall, when introduced in any action, be prima–facie evidence of the registrant's exclusive right to use the registered mark in this commonwealth ...." Mass. Gen.Laws Ann. ch. 110B, § 4 (West Supp.1980–1981).

Although this provision permits an opposing party to prove "any legal or equitable defense or defect which might have been asserted if such mark had not been registered", *id.*, we believe that the constructive notice and prima facie validity effects of section 4 remove any need that previously might have been thought to call for the preemptive features of the "natural expansion" doctrine. The only conceivable virtue of this doctrine thus has been replaced by a statutory scheme that provides for a more accessible mechanism for notifying of preexisting rights those who seek to adopt a "new" trademark. We therefore also reject the district court's use of the "natural expansion" doctrine as a matter of state law.[13]

We vacate the judgment below and remand this case to the district court for further consideration of the appellant's counterclaim in light of this decision.

*So ordered.*

---

**13.** We intend this holding to apply both to Rax's trademark infringement claim and its unfair competition claim since Rax has not suggested how these two grounds might differ in the present context.