**THRIFTY RENT–A–CAR SYSTEM, INC., Plaintiff,**

v.

**THRIFT CARS, INC., Defendant.**

**Civ. A. No. 83–1979–Y.**

United States District Court, D. Massachusetts.

July 15, 1986.

Paul H. Johnson, esq., Mead, Johnson & Stevenson, Tulsa, Okl., and William Looney, Looney & Grossman, Boston, Mass., for plaintiffs.

William J. Brennan, III, Smith, Stratton, Wise & Heher, Princeton, N. J. and William S. Dorman, Tulsa and Richard F. McCarthy, Willcox, Pirozzolo and McCarthy, Boston, Mass., for defendants.

## MEMORANDUM OF DECISION

YOUNG, District Judge.

This is an action for trademark infringement and false designation of origin brought pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and for unfair competition at common law. The plaintiff, Thrifty Rent-a-Car System, Inc. ("Thrifty Rent-a-Car") seeks a permanent injunction, damages, costs, and attorneys' fees against the defendant, Thrift Cars, Inc. ("Thrift Cars").

In large measure, the facts are undisputed. On March 3, 1958, one L.C. Crow, an individual doing business as Thrifty Rent-a-Car System, commenced renting cars under the trade name "Thrifty" from his place of business on Route 66, Tulsa, Oklahoma. Early in 1962, Stemmons, Inc., an Oklahoma corporation in the business of re-selling used cars, purchased Crow's business and began to expand it. On March 15, 1962, the first rental using the "Thrifty" trade name occurred outside the state of Oklahoma in Houston, Texas. Recognizing the possibilities for expansion of the car rental business, Stemmons, Inc. commenced opening other car rental outlets in Wichita, Kansas, Dallas, Texas, and St. Louis, Missouri. Stemmons, Inc. also changed its name to The Thrifty Rent-a-Car System, Inc., the present plaintiff Thrifty Rent-a-Car. On July 30, 1962, Thrifty Rent-a-Car made application to the United States Patent Office to register the service mark "Thrifty Rent-a-Car System."

In October, 1962, Peter A. Conlon began to operate a car rental business with two cars out of his home in East Taunton, Massachusetts. Conlon was completely unaware of the existence and operations of Thrifty Rent-a-Car in the Southwest and Midwest. On October 24, 1962, Conlon incorporated his business as Thrift Cars, Inc., the defendant Thrift Cars. Thrift Cars' business in East Taunton operated somewhat differently than the standard car rental business. Since East Taunton, Massachusetts is not a major commercial center, Thrift Cars did not operate a retail car rental outlet there where one could walk in off the street and select a rental car from a waiting fleet. Rather, Thrift Cars provided a more customized service wherein the rentor would arrange for his or her rental car in advance and Thrift Cars would then deliver the car which had been rented or leased to the customer's location and would pick it up thereafter at that or another pre-arranged location at the end of the rental term. Thus, in the years immediately following 1962 Thrift Cars, on occasion, delivered rental vehicles to customers at Logan International Airport in Boston, at Provincetown, the Falmouth Marina, Hyannis, and Nantucket. Thrift Cars advertised its custom car rental service in the Taunton area yellow pages phone directory, in the Taunton Daily Gazette, in the Cape Cod Times—a newspaper of general circulation serving the Cape Cod area as well as the islands of Martha's Vineyard and Nantucket—and in The Anchor—the newspaper of the Roman Catholic Diocese of Fall River. For a time during 1963 Thrift Cars advertised in The Inquirer and Mirror, a Nantucket newspaper with, at that time, a circulation of approximately eight thousand.

After 1963, however, Thrift Cars dropped its advertisements in The Inquirer and Mirror since business gleaned from the yellow pages was sufficient for its needs.

On July 26, 1964, the United States patent office granted service mark No. 774,288 "Thrifty Rent-a-Car" to the plaintiff Thrifty Rent-a-Car. This official confirmation of Thrifty Rent-a-Car's service mark was but one indicator of its business success. Indeed, Thrifty Rent-a-Car had, during the years following 1962, continued an aggressive and successful system of expansion through franchises and directly owned rental agencies. Thrifty Rent-a-Car's first Massachusetts outlet opened on December 5, 1967.

Thrift Cars, meanwhile, had not been idle. For some time it had desired to operate a traditional car rental facility at the Nantucket Airport and on May 30, 1970, this dream was realized when the proper licensing authorities permitted Thrift Cars to establish a car rental facility at that site. This facility advertises its existence by calling itself "Thrift Cars" through both on-site signs and off-site newspaper and yellow pages advertising. Thrift Cars' chief executive officer Peter Conlon having removed to Nantucket, Thrift Car's operations are primarily located there and the original East Taunton site is largely dormant.

Collision with Thrifty Rent-a-Car was now inevitable. When Thrift Cars operated its customized service delivering cars from East Taunton, its market impact was felt primarily in what the car rental industry considers the tertiary market, i.e. the market which serves those individuals having need of replacement cars for periods which bridge the short term car rental and the longer term automobile lease. When Thrift Cars opened its traditional Nantucket outlet, however, it entered what is known as the resort market, a fiercely com-petitive market in which Thrifty Rent-a-Car had enjoyed considerable success.[1] By the time of trial, Thrifty Rent-a-Car had franchises in twenty three different locations in Massachusetts[2] and, with five hundred rental car outlets world wide, it is fifth in car rental locations after Hertz, Avis, National, and Budget car rental services (in that order). There is no doubt that, given the mobility of society, confusion exists between the car rental services provided by Thrifty Rent-a-Car and Thrift Cars, at least within the County of Nantucket. The parties stipulate as much.

1. *Common Law Background*

To understand the issues before the Court, it is helpful to review briefly a few salient principles of the common law of trademarks.

In *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), the Supreme Court determined that the senior user of a trademark cannot monopolize markets that neither its trade nor reputation has reached.

> Since it is the trade, and not the mark, that is to be protected, a trade-mark acknowledges no territorial boundries of municipalities or states or nations, but extends to every market where the trader's goods have become known and identified by his use of the mark. But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article.

240 U.S. 403, 416, 36 S.Ct. 357, 361, 60 L.Ed 713. In *Hanover,* the court declined to enjoin Allen & Wheeler Co. from selling Tea Rose flour in four southern states, even though Hanover Star had first marketed Tea Rose flour in New England. Allen & Wheeler had adopted the mark Tea Rose in good faith, without knowledge of Hanover Star's prior use. The companies'

---

1. The other major component of the car rental market is what is known as the commercial market, serving primarily business travelers. Examples of commercial car rental outlets are to be found at Logan International Airport in Boston.

2. To give some sense of the geographical penetration of Thrifty Rent-a-Car in Massachusetts, it is worthwhile listing the location of its car rental franchises. They are presently located in Abington, Arlington, Bedford, Boston, Brookline, Cambridge, East Hampton, Falmouth, Framingham, Haverhill, Holbrook, Hyannis, New Bedford, Norwood, Orleans, Pembroke, Plymouth, Quincy, Randolph, Raynham, South Attleboro, Wellfleet, and Weymouth.

markets were "remote," meaning that neither had sold or advertised in territory served by the other.

In *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918), the court extended *Hanover*, holding that a senior user enters a junior user's territory subject to whatever rights the junior has acquired. In *United Drug*, United Drug Co. was the original distributor of Rex drugs and first marketed them in New England. Upon expanding into Louisville, Kentucky, it encountered competition from Rectanus Co., a local producer and vendor of Rex blood purifier. Like Allen & Wheeler in *Hanover*, Rectanus had adopted the contested mark in good faith, though after United's use in a remote market. The Court refused to enjoin Rectanus and summarized its reasons:

> [T]he general rule is that as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question.... But the reason is that purchasers have come to understand the mark as indicating the origin of the wares, so that its use by a second producer amounts to an attempt to sell his goods as those of his competitor. The reason for the rule does not extend to a case where the same trademark happens to be employed simultaneously by two manufacturers in different markets separate and remote from each other, so that the mark means one thing in one market, and an entirely different thing in another. It would be a perversion of the rule [if] an innocent party who had in good faith employed a trade-mark in one State, and by the use of it had built up a trade there, being the first appropriator in that jurisdiction, might afterwards be prevented from using it, with consequent injury to his trade and good-will, at the instance of one who theretofore had employed the same mark but only in other and remote jurisdictions, upon the ground that its first employment happened to antedate that of the first-mentioned trader.

248 U.S. 90, 100, 39 S.Ct. 48, 51, 63 L.Ed. 141.

Subsequent cases have further developed the principles articulated in *Hanover* and *United Drug*. A senior user who tries to enter a good-faith junior user's remote market can be enjoined from doing so. *Food Fair Stores, Inc. v. Square Deal Market Co.*, 206 F.2d 482 (D.C.Cir.1953); *Sweetarts v. Sunline, Inc.*, 380 F.2d 923 (8th Cir.1967). Similarly, a junior user may not enter markets where the senior user has acquired exclusive rights. *Id.*

The essence of the common law doctrine found in *Hanover* and *United Drug*, then, is that two parties who innocently adopt similar trademarks and use them in separate markets carve out territories for themselves. Within its territory, each party can use its mark free from interference by the other. *See generally* 2 McCarthy, *Trademarks and Unfair Competition* § 26:1 at 286–88 (2d ed. 1984).

The actual geographical area a party carves out is a question of fact, and a court delimits the area by examining the party's reputation, advertising, and sales with respect to the territory in question. 2 McCarthy, *supra,* § 26:12 at 309. In each instance, the test is whether the party's mark is sufficiently known there, or whether its sales there are of sufficient volume, to create a likelihood of confusion among consumers, should a second user enter the same territory. *Sweetarts v. Sunline, Inc., supra* at 927. A party who has established a reputation in an area may acquire exclusive rights to its mark there, even though the product bearing the mark is unavailable. *Stork Restaurant v. Sahati,* 166 F.2d 348 (9th Cir.1948) (national reputation of Stork Club, a celebrity-patronized New York City night club, precluded adoption of name "Stork Club" by local San Francisco bar). To the extent advertising extends customer awareness of a mark into new territory, it is a factor in deciding whether the territory has been successfully appropriated by the mark's owner. However, trademark rights cannot be established by advertising alone. *Wrist-Rocket Manufacturing Co., Inc. v. Saunders Archery Company,* 578 F.2d 727, 732 (8th

Cir.1978). Though sales are an important consideration in delimiting a trademark owner's area, sales must be "significant enough to pose the real likelihood of confusion." *Sweetarts v. Sunline, Inc., supra* at 929. Sporadic and inconsequential sales cannot establish an owner's exclusive right to its mark. *Id.*

Most cases applying the *Hanover-United Drug* doctrine hold that a junior user charged with trademark infringement can successfully defend itself by proving two elements. 2 McCarthy, *supra*, § 26:1 at 288. First, it must show it adopted the mark in good faith, meaning without knowledge of prior use by a senior user.[3] *Id.* This Court finds Thrift Cars did, in fact, adopt its mark in good faith. Second, it must demonstrate that the area where it used the mark was remote, meaning that the mark of the senior user was not known to customers in that area. *Id.* This Court finds that, at least as to the area of the City of Taunton, Thrift Cars' use of its mark was "remote" from the senior use by Thrifty Rent-a-Car.

## 2. The Lanham Act

In passing the Lanham Act, Congress intended to provide uniform, comprehensive federal law to govern questions of trademarks used in and affecting interstate commerce. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Since this case raises questions involving trademarks in interstate commerce, the Lanham Act provides the controlling law. *See Mister Donut of America, Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 844 (9th Cir.1969) (question of whether to enjoin local Orange County donut business from expanding into other areas of California served by national plaintiff was governed by Lanham Act because

expansion would affect interstate commerce).

The Lanham Act encompasses a policy prohibiting state interference with rights the Act accords federally registered trademarks. 15 U.S.C. § 1127; *accord Burger King of Florida, Inc. v. Hoots*, 403 F.2d 904 (7th Cir.1968). In *Burger King*, a case similar in some ways to the instant case, the court resolved competition between the Lanham Act and a state trademark-registration statute. The plaintiff, the national, federally-registered chain of Burger King restaurants, sought to enjoin the defendant, a local Mattoon, Illinois, restaurant operating under the name Burger King, from opening a second restaurant in another Illinois city. The defendant urged the court to incorporate its Illinois registration into the Lanham Act and grant it trademark rights to the entire state, not just Mattoon. The court refused, bluntly clarifying the legal priorities:

> [T]he policy ... to provide protection of federally registered marks used in interstate commerce [ ] may not be defeated or obstructed by State law [and if] state law conflicts with the policy it "must yield to the superior federal law."
>
> ....
>
> ... [W]hether or not Illinois intended to enlarge the [rights of state registrants at] common law ..., the Illinois Act does. not enlarge [defendant's common law rights] where the federal mark has priority.

403 F.2d 904 at 907, 908.

To the extent, then, that Thrift Cars suggests rights to the marks "Thrift" and "Thrifty" are controlled by common law and state statutes, and not the Lanham Act, it is in error. In *Burger King, supra,* a junior user's state registration of its mark could not enhance its rights at the expense of a senior user who held a federal

---

**3.** One may question why trademark rights should turn on a junior user's subjective state of knowledge. The answer is two-fold. First, a merchant who adopts a trademark knowing that another party already uses it in a remote area must surely intend to prevent the senior user from expanding into his own territory. Such behavior conflicts with a policy of fostering trade by allowing a merchant the maximum benefit of his good will. Second, a junior user's knowledge may evidence knowledge by others in the area, and a consequent lack of remoteness. 2 McCarthy, *supra,* § 26:4 at 292–93.

registration. Here, junior user Thrift Cars, who does not hold a state registration but relies only on the common law, has even less hope of similarly enhancing its rights. The Lanham Act has preempted the salient areas of trademark law discussed above and controls the rights of both parties in this case. *See also Mister Donut, supra* at 844.

### 3. *The Lanham Act and the § 1115(b)(5) Defense*

■ The Lanham Act statutorily expanded the common law rights of a senior user of a trademark who registers its mark under the Act. Lanham achieves that result because registration is "constructive notice of the registrant's claim of ownership." 15 U.S.C. § 1072. Consequently, a junior user charged with trademark infringement by a senior user who is a federal registrant is ordinarily deprived of a defense because it cannot prove good faith adoption of the mark. *See generally* 2 McCarthy, *supra* § 26:13 at 313–14.

Federal registration under the Lanham Act is prima facie evidence of the registrant's exclusive right to a mark, subject to common law legal and equitable defenses. 15 U.S.C. § 1115(a); *Park "N Fly, Inc., supra.* After a waiting period, a registrant may quiet title in its mark, removing the threat of common law defenses, by making the mark "incontestable."[4] 15 U.S.C. § 1065; *Park 'N Fly, Inc., supra.* Incontestability is "conclusive evidence" of the registrant's exclusive right to the mark, subject only to particular defenses specified in the Act. 15 U.S.C. § 1115(b); *Park 'N Fly, Inc., supra.* Thrifty Rent-a-Car's mark became incontestable on July 26, 1969.

In light of this uncontroverted fact, Thrift Cars has but one defense, 15 U.S.C. § 1115(b)(5), relevant to the case at bar:

> If the right to use the registered mark has become incontestable under § 1065 of this title, the registration shall be con-clusive evidence of the registrant's exclusive right to use the registered mark in commerce ... except when one of the following defenses or defects is established:
>
> ....
>
> (5) That the mark whose use is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to registration of the mark under this chapter ...: Provided, however, that this defense of defect shall apply only for the area in which such continuous prior use is proved
>
> ....

15 U.S.C. § 1115(b).

■ Proof of § 1115(b)(5), then, is not a defense on the merits to alleged trademark infringement. 2 McCarthy, *supra,* 26:18 at 329. Rather, proving § 1115(b)(5) reduces the import of federal registration from conclusive evidence, to mere prima facie evidence, of a registrant's exclusive right to its mark. *Id.* A non-registrant junior user may then raise the common law *Hanover-United Drug* defense with respect to the area in which it used the contested mark before registration. *Id.; see Steak & Brew, Inc. v. Beef & Brew Restaurant, Inc.,* 370 F.Supp. 1030 (1974). Such a non-registrant junior user has the burden of pleading and proving this defense. 2 McCarthy, *supra* 26:18 at 323; *see also Foxtrap, Inc. v. Foxtrap Inc.,* 671 F.2d 636, 640 (D.C. Cir.1982).

### 4. *Delimiting Junior User's Area of Continuous Prior Use*

■ Under the Lanham Act, a senior user's federal registration of a mark has the effect of freezing a junior user's market area. *Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.,* 477 F.2d 150 (6th Cir.1973); *Burger King, supra.* This is so because the junior user cannot

---

**4.** Generally, a registrant may make its mark incontestable by filing an affidavit within one year after the expiration of any five year period following registration, during which the mark has been in continuous use. 15 U.S.C. § 1065.

raise the *Hanover-United Drug* defense against charges of trademark infringement with respect to markets into which it expands after registration. Registration is constructive notice of the senior user's appropriation of the mark in those markets and destroys the good faith element of the junior user's defense.

■ The area frozen by registration, or "area [of] continuous prior use," 15 U.S.C. § 1115(b)(5), is the area in which the junior user continuously marketed its goods before the mark was registered. *Burger King, supra* at 908; *Concord Laboratories, Inc. v. Concord Medical Center,* 552 F.Supp. 549, 552 (1982). As at common law, the junior user's reputation, advertising, and sales delimit its frozen area. 2 McCarthy, *supra,* § 26:18 at 327. The area will not necessarily coincide with state boundaries. *Burger King, supra; see generally* 2 McCarthy, *supra,* § 26:12 at 309–12. Thrift Cars is in error where it argues that by good-faith use of its mark in remote East Taunton, it acquired exclusive rights to the mark throughout Massachusetts. *Raxton Corporation v. Anania Associates, Inc.,* 668 F.2d 622 (1st Cir.1982) (Raxton II), on which Thrift Cars heavily relies, is distinguished on its facts. In *Raxton,* neither party had obtained a federal registration of its mark, but the defendant junior user had a Massachusetts registration. *Raxton Corporation v. Anania Associates, Inc.,* 635 F.2d 924 (1st Cir.1980) (Raxton I). In the instant case, senior user Thrifty Rent-a-Car has a federal registration of its mark, and defendant junior user Thrift Cars has no Massachusetts registration.

■ In light of the above discussion, July 26, 1964—the date of Thrifty Rent-a-Car's federal trademark registration—emerges as the crucial date for determining the rights of the parties. On that date Thrifty Rent-a-Car was using its service mark in at least Oklahoma, Texas, Kansas, and Missouri. For nearly two years prior to that date, Thrift Cars had been using its confusingly similar mark—in complete good faith—within the area of East Taun-

ton, Massachusetts. This Court finds that defendant Thrift Cars has not established a continuous market area for its mark outside East Taunton, Massachusetts, from 1962 to 1964. Though Thrift Cars showed limited advertising in southern Massachusetts during the years in question, advertising alone cannot establish trademark rights. *Wrist-Rocket Manufacturing Co., supra* at 732. Thrift Cars has also not sustained its burden with respect to "sales," or in this case rentals, to customers outside East Taunton. The sporadic rentals in Nantucket and elsewhere about which Thrift Cars presented evidence are insufficient to establish the continuous prior use of a trademark that the Lanham Act requires. *See Sweetarts v. Sunline, Inc., supra; Wrist-Rocket Manufacturing Co., supra.* The simple fact is that, as of July 26, 1964, Thrift Cars was known only to those who lived in the Taunton area and those in Fall River, the Cape, and Islands areas who desired to seek Thrift Cars out in East Taunton and negotiate with it there, either by telephone or in person.

■ In finding that defendant Thrift Cars' "area [of] continuous prior use" is limited to East Taunton, the Court does not foreclose all activity by defendant outside East Taunton. While the Court may, as part of its remedy, limit a party's right to advertise, *see id.; Holiday Inn v. Holiday Inns, Inc.,* 534 F.2d 312 (C.C.P.A.1976), *aff'd,* 645 F.2d 239 (4th Cir.1981), the Court should and does consider the nature of a defendant's product and marketing scheme in fashioning a remedy which properly balances competing interests. *See Wrist-Rocket Manufacturing Co., supra* at 732 (nature and marketing of slingshots considered in delimiting defendant's pre-registration market area); *Flavor Corporation of America v. Kemin Industries, Inc.,* 503 F.2d 729 (8th Cir.1974) (injunction against advertising in two states where plaintiff had established exclusive rights modified to let defendant continue advertising in national publications).

Here, the nature of Thrift Cars' car rental business is to provide customers a ve-

hicle by which to travel from one city to another. To confine Thrift Cars' rentals to East Taunton would destroy its business and deny it the benefit of the § 1115(b)(5) defense to which it is entitled. Such an order would frustrate the intent of Congress in retaining the defense. The intended effect of § 1115(b)(5), far from trying to diminish a good-faith junior user's rights, is to allow the junior user maximum benefit of any good will acquired by hard and honest labor. The statute achieves that result by freezing, not cutting back, the junior user's business activities on the date of registration. *See Old Dutch Foods Inc. v. Dan Dee Pretzel & Potato Chip Co., supra; Burger King, supra.*

### ORDER

Commencing on July 25, 1986 the defendant Thrift Cars, Inc. is permanently enjoined from using the word "Thrift" in any way in the conduct of any car or truck rental or leasing business outside Taunton, Massachusetts, including the facility on Nantucket. Thrift Cars' business activities on July 26, 1964, the date of registration, did not include operating facilities on Nantucket or in any other area outside East Taunton. Thrift Cars may not subsequently expand its use of the Thrift trade name to include such operations. However, to the extent that Thrift Cars made rentals to customers outside East Taunton before July 26, 1964 using the Thrift trade name, it may continue to make such rentals, i.e. it may, in response to the advertising delimited below, supply rental cars driven from the East Taunton facility to any point in Massachusetts, including the Cape and Islands.

Thrift Cars is enjoined from advertising its business using the Thrift trade name outside East Taunton, except in those media which the record shows it used before July 26, 1964. Specifically, Thrift Cars may advertise in the yellow pages of the Taunton area telephone book, in the Cape Cod Times, the Inquirer and Mirror, the Taunton Daily Gazette, and The Anchor. Thrift Cars may not advertise in media, other than those publications listed above, intended to target customers outside East Taunton. Thrift Cars may advertise in any medium intended to target only East Taunton customers.

Thrifty Rent-a-Car is enjoined from operating any business establishment in East Taunton. Similarly, Thrifty Rent-a-Car may not advertise in media intended to principally target the East Taunton community. Thrifty Rent-a-Car may advertise in media intended to principally target areas outside East Taunton and in national and state advertising schemes.

In so ordering, the Court realizes that some targets of the plaintiff Thrifty Rent-a-Car's national and state advertising campaigns may also be exposed to the advertisements of the defendant Thrift Cars. However, the bare possibility of customer confusion is insufficient to justify the punitive effect of enjoining defendant Thrift Cars from all advertising outside East Taunton. *Cf. Flavor Corporation of America v. Kemin Industries, Inc., supra* at 733 ("The bare possibility that a potential customer of [plaintiff] ... might be misled by [defendant's] advertising ... is insufficient to justify the punitive effect of an injunction...."). *See also Burger King, supra* at 909 ("The mere fact that some people will travel from one market area to another [and be exposed to both marks] does not, of itself, establish that confusion will result.") Moreover, the Lanham Act does not mandate total elimination of customer confusion. *Holiday Inn v. Holiday Inns, Inc., supra* at 317–18 (approving of the judgment in *Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc.,* 293 F.2d 685 (C.C.P.A.1961): "All the members of the court deciding that case were fully aware that there had been confusion, was likely to be more and that the court which adjudicated the applicant's right to use, in imposing conditions on the manner of use, hoped only to minimize, not to eliminate, confusion and, of course, to protect the other party's private rights.") *Accord Burger King, supra* at 909 ("The court's decision restricted use of

758

the mark by plaintiffs and defendants to ... separate markets so that public confusion would be *reduced to a minimum.*) [Emphasis added]. This Court is confident that its order accords with the intent of Congress in passing the Lanham Act and satisfactorily protects the private rights of the parties in this litigation.

Thrifty Rent-a-Car shall recover its statutory costs but its claim for damages is dismissed since, upon the present record, the assessment of damages would be utterly speculative.

SO ORDERED.